IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH P. NORELLI, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>          Petitioner,<br><br>    vs.<br><br>HTH CORPORATION, PACIFIC BEACH CORPORATION and KOA MANAGEMENT, LLC, A Single Employer, d/b/a PACIFIC BEACH HOTEL,<br>          Respondents.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIV. NO. 10-00014JMS/LEK<br><br>ORDER: (1) DENYING RESPONDENTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION; AND (2) GRANTING THE PETITION FOR INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT |

## <u>ORDER: (1) DENYING RESPONDENTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION; AND (2) GRANTING THE PETITION FOR INJUNCTION UNDER SECTION 10(J) OF THE NATIONAL LABOR RELATIONS ACT</u>

## I. <u>INTRODUCTION</u>

Petitioner Joseph P. Norelli ("Petitioner"), Director of Region 20 of

the National Labor Relations Board (the "Board"), asserts that HTH Corp.

("HTH"), Pacific Beach Corp. ("PBC"), and Koa Management, LLC ("Koa")

d/b/a/ the Pacific Beach Hotel (the "Hotel") (collectively, "Respondents") have

engaged in a litany of violations of the National Labor Relations Act ("NLRA").

On August 15, 2005, the Board certified International Longshore and Warehouse Union, Local 142, AFL-CIO (the "Union") as the exclusive bargaining representative of the Hotel employees.  Petitioner alleges that since that time, Respondents have engaged in unfair bargaining with the Union, terminated certain employees due to their Union support, unlawfully withdrew certification of the Union, and unilaterally changed the terms and conditions of employment of the Hotel employees.  On September 30, 2009, Administrative Law Judge James M. Kennedy (the "ALJ") found that Respondents had committed numerous NLRA violations (the "ALJ Decision"), and Respondents have appealed the ALJ Decision to the Board.

While the appeal to the Board proceeds, Petitioner seeks interim injunctive relief from this court pursuant to § 10(j) of the NLRA, 29 U.S.C. § 160(j) (referred to herein as "§ 10(j)" or "§ 160(j)").  Specifically, Petitioner requests that the court issue an injunction ordering Respondents to, among other things, recognize the Union, bargain in good faith with the Union, reinstate several employees, and rescind unilateral changes made to the terms and conditions of employment.  Respondents object to the Petition and have also filed a Motion to Dismiss, arguing that the Board did not properly authorize the § 10(j) Petition. Based on the following, the court DENIES Respondents' Motion to Dismiss and

2

GRANTS the § 10(j) Petition.

## II. <u>BACKGROUND</u>

### A.    **Factual Background**[1]

The Hotel is located in Waikiki and consists of two towers with a total of 837 rooms, and a lower central building housing shops, restaurants, and a multi-story fish tank.  Pet'r Ex. C at II:1862-63, 1884.  HTH owns the Hotel while PBC, a wholly owned subsidiary of HTH, is the management company and the current employer of the Hotel employees.  *Id.* at I:68, 91.  As for Koa, HTH and PBC formed Koa in 2004 to satisfy the requirements of a lender, the UBS Bank, when the Hotel became collateral for a loan to HTH.  *Id.* at I:83-5.

All of these entities -- HTH, PBC, and Koa -- are owned by the Hiyashi family.  *Id.* at I:71.  Neither HTH nor Koa has any employees of its own, and these entities share many of the same officers and executives.  *Id.* at I:68, 85, 89-90.  The officers of HTH and PBC are "essentially the same," and Corine Watanabe ("Watanabe") and her cousin, John Hayashi ("Hayashi") are members of the Board of Directors for both companies.  *Id.* at I:71-2, 75, 89.  Watanabe is also the special member of Koa, and Robert M. Minicola ("Minicola") is the Regional

---

[1]  Because the record in this action is both detailed and voluminous, this background section provides only enough facts to provide context to the issues presented in the Petition.  The court provides additional facts in its discussion of whether Petitioner is entitled to injunctive relief.

Vice President of Operations for HTH and PBC. *Id*. at I:67, 85. While Minicola reports to Watanabe, he holds decision-making authority on all labor-related issues for all of Respondents' entities, including HTH. *Id*. at I:76-79.

Since beginning its drive to organize the Hotel's employees in 2002, the Union has faced opposition from Respondents. The Board overturned the first election in July 2002 after finding that Respondents engaged in objectionable conduct by coercively interrogating employees and maintaining an overly broad no-solicitation policy. *HTH Corp.*, 342 NLRB 372 (2004). For the second election on August 24, 2004, Respondents challenged several ballots, resulting in the Board ordering those ballots to be counted and the Union winning the election by one vote. *Pacific Beach Corp.*, 344 NLRB 1160 (2005). On August 15, 2005, the Regional Director issued a certificate of representation in favor of the Union. Pet'r Ex. C at I:163; Pet'r Ex. D at GC3 p.4.

After the Union was certified, Minicola began negotiating a collective bargaining agreement ("CBA") with Dave Mori ("Mori"), the chief spokesperson for the Union. Pet'r Ex. C at I:190-91. From November 29, 2005 through December 14, 2006, Minicola and Mori met for 37 sessions and reached approximately 171 tentative agreements. Pet'r Ex. D at GC3 p.2 ¶ 1; *id.* at GC17.

Despite this seeming progress, negotiations were far from smooth and

4

Minicola and Mori were unable to reach a final agreement.  Minicola insisted on

several provisions that would significantly limit the Union's rights, including:

(1) a Union recognition clause in which Respondents would have the "sole and

exclusive right to unilaterally and arbitrarily change, amend, and modify the

certified bargaining unit" and the conditions of employment; (2) a management

rights clause recognizing that Respondents may direct and manage the work force

at will without Union interference; (3) an open shop clause that allows employees

to choose whether to join the Union and pay dues; and (4) a complaint/grievance

procedure for employees that did not include arbitration or other procedural

safeguards.  Pet'r Ex. D at GC24.  Minicola did not waiver from these bargaining

positions and no CBA was ever finalized.  Pet'r Ex. C at I:235-36; Mori Aff. 2-3.

　　　　While these negotiations were going on, Respondents were having

discussions with Outrigger Hotels Hawaii ("Outrigger") over the possibility of a

joint venture or management agreement.  Pet'r Ex. C at I:374.  Outrigger

established a separate entity, PBH Management, LLC ("PBHM"), and on

September 7, 2006, Koa and Outrigger signed a Management Agreement ("MA")

for PBHM to direct the operations of the Hotel effective January 1, 2007.  *Id.* at

I:239; Pet'r Ex. D at GC38.  Minicola assured Mori that the change in management

would be a "seamless transition," "that the employees would all be hired with the

same seniority, same job[s], [and same] pay[,]" and that Outrigger would be

"honoring all [tentative agreements] and would [resume] bargaining with the

[U]nion."  Pet'r Ex. C at I:237-38.  After management changed, Mel Wilinsky

("Wilinsky"), the Executive Vice President and Chief Financial Officer for

Outrigger, began negotiations with Mori, and Minicola ceased his face-to-face

negotiations.  *Id.* at I:239-42, 376.

Negotiations between PBHM and the Union continued between

February 2007 and July 2007 and the parties made significant progress -- Wilinsky

and Mori reached 13 tentative agreements, including agreements on issues that

Minicola previously would not concede such as an arbitration process, union right

of access, union bulletin boards, and a partial agreement on the management rights

clause.  Pet'r Ex. D at GC26; *see also* Pet'r Ex. C at I:243-47.  By July 2007, there

were only two outstanding issues -- dues check-off and the agency shop clause.

Pet'r Ex. C at I:252-53.

During this process, it was unclear -- apparently to both the Union and

PBHM -- what Respondents' role was in the negotiations and the employment of

the Hotel employees.  Specifically, the Union had lingering questions regarding

whether PBHM truly had control over the Hotel's operation and whether HTH in

addition to PBHM needed to agree to any CBA.  *Id.* at I:243-46, 256-58; Pet'r Ex.

6

D at GC28.  In response to the Union's questions, both Minicola and Wilinsky

explained that HTH was no longer the employer of the Hotel's employees and that

PBHM had been the new employer of the Hotel's employees as of January 1, 2007.

*Id*. at GC30, GC32.

In fact, the MA -- which PBHM and Respondents kept confidential --

required "[Respondents'] approval of any agreement affecting the Hotel (i) the

term of which is more than one (1) year in length and that cannot be terminated

upon thirty (30) days' notice by [PBHM.]"  *Id*. at GC38 ¶¶ 3.2.c.  Due to this

provision, PBHM operated under the assumption that it needed Respondents'

approval before entering into a CBA.  On June 29, 2007, PBHM's attorney,

Richard Rand ("Rand"), notified Respondents that they were close to an

agreement, but given Rand's understanding that Minicola was "very unhappy"

with the concept of a CBA, PBHM would need more direction as to how to

proceed.  Pet'r Ex. D at GC39.  On July 30, 2007, Rand asked Koa, as "owner"

under the MA, to consent to Rand providing the MA's contract approval provision

to the Union (along with other provisions as well), and that Koa approve 11

specific proposals for the CBA.  *Id*. at GC44.  Rand explained that if PBHM made

these 11 proposals, the Union would accept them and the parties would likely enter

into a CBA.  *Id.*  Rand further asserted that if Respondents refused to consent,

Respondents would be in breach of the MA and that PBHM would no longer be able to bargain in good faith with the Union.  *Id.*; *see also* GC45.

On August 3, 2007, PBHM received a formal notice from Minicola stating that Koa was terminating PBHM's operation of the Hotel pursuant to Section 18.3 of the MA.[2]  *Id.* at GC46.  On the same date, a press release announced that the MA with PBHM was going to be cancelled and that HTH would resume managing the Hotel effective December 1, 2007.  Pet'r Ex. C at I:245.  Respondents assert that Koa terminated the MA for various reasons including, for example, disputes over fees and commissions, PBHM's failure to timely install a reservation system and keep occupancy rates up, and the death of fish in the Hotel's salt water tank.  *See id.* at I:378-80, 390-94.

Unlike the transition from HTH to PBHM, Minicola informed the employees that the transition from PBHM to HTH would not be seamless and he could not commit to how many employees would be hired.  *Id.* at I:278.  Indeed, HTH instituted an "application process for employment" in which employees were

---

[2]  Section 18.3 of the MA provides:
    Termination on or Before June 1, 2008.  Notwithstanding anything
    to the contrary contained herein, Owner may terminate this
    Agreement for any reason whatsoever in the exercise of its sole
    discretion at any time from the Commencement Date to and
    including June 1, 2008.  Upon such termination, all of the
    provisions of Article XX shall apply.
Pet'r Ex. D at GC46.

required to re-apply for their jobs, submit to drug testing and a 90-day probation period, and sign a confidential "conflict of interest" agreement. *Id.* As of November 30, 2007, all of the employees were terminated from PBHM, and if the previous employees received a job offer, they began employment for HTH on December 1, 2007. *Id.* at I:279. The employees who were not re-hired included seven members of the Union's negotiating committee. *Id.* at I:280.

  As of December 1, 2007, Minicola withdrew recognition of the Union on the basis that employees told him that a majority of the employees no longer supported the Union, and he observed that employees did not attend Union rallies. *Id.* at I:124-25; Pet'r Ex. D at GC7. After refusing to recognize the Union, Minicola made various changes to the terms and conditions of employment of Hotel employees, including, for example, wage increases for certain groups, Pet'r Ex. C at I:136; fewer management positions and reduced staffing as compared to December 2006, *id.* at I:120; and former full-time employees being rehired on a part-time or on-call basis, beginning on December 1, 2007. *Id.* at I:139.

## B.    Procedural Background

  From January 22, 2007 through May 15, 2008, the Union filed with the Board a number of charges against Respondents. On August 29, 2008, Petitioner issued an initial Consolidated Complaint alleging that Respondents

violated 29 U.S.C. § 158(a)(1), (3) and (5).  After 13 hearing days from November

4 through 12, 2008 and February 19 through 27, 2009, the ALJ  Decision was

issued on September 30, 2009, finding that Respondents had violated the NLRA.

*HTH Corp.*, 2009 WL 3147894 (NLRB Sept. 30, 2009); *see also HTH Corp.*, 2009

WL 3550832 (NLRB Oct. 20, 2009) (issuing errata to the ALJ Decision).  The ALJ

Decision is currently on appeal to the Board -- Respondents appeal the ALJ

Decision in full and request that the record be reopened, while Petitioner seeks a

limited appeal regarding relief.  *See* Pet'r Br. 38-40.

On January 7, 2010, Petitioner brought this Petition seeking an

injunction under § 10(j) of the NLRA pending the final Board decision.  On

February 16, 2010, Respondents filed an Opposition, and on February 23, 2010,

Petitioner filed a Reply.  The parties also submitted Supplemental Briefing on

March 2, 2010.

In addition to the substantive briefs, on January 20, 2010,

Respondents filed a Motion to Dismiss Petition for lack of subject matter

jurisdiction.  On February 12, 2010, the Petitioner filed an Opposition to the

Motion to Dismiss, and on February 22, 2010, Respondents filed a Reply.  A

hearing on both the Petition and the Motion to Dismiss was held on March 8, 2010.

At the conclusion of the hearing, the court orally denied Respondents'

Motion to Dismiss, granted the Petition, and required some additional steps by the parties.  Pursuant to the court's requests, on March 12, 2010, Petitioner submitted a declaration asserting that the terminated employees wished to be reinstated at the Hotel.  On March 22, 2010, the parties also submitted a statement regarding the scope of injunctive relief.  This written order follows.

## III.  <u>STANDARDS OF REVIEW</u>

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss claims over which it lacks proper subject matter jurisdiction.  The court may determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) so long as "the jurisdictional issue is [not] inextricable from the merits of a case."  *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).

"[U]nlike a Rule 12(b)(6) motion, in a Rule 12(b)(1) motion, the district court is not confined to the four corners of the complaint -- it may consider facts and need *not* assume the truthfulness of the complaint[,]" and the existence of disputed material facts will not preclude the court from evaluating the existence of subject matter jurisdiction.  *Americopters, LLC v. Fed. Aviation Admin.*, 441 F.3d 726, 732 n.4 (9th Cir. 2006); *see also Ass'n of Am. Med. Colls. v. United States*,

217 F.3d 770, 778 (9th Cir. 2000).  The moving party "should prevail [on a motion

to dismiss] only if the material jurisdictional facts are not in dispute and the

moving party is entitled to prevail as a matter of law."  *Casumpang v. Int'l*

*Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060-61 (9th Cir.

2001) (citation and quotation signals omitted); *Tosco Corp. v. Cmtys. for a Better*

*Env't*, 236 F.3d 495, 499 (9th Cir.  2001).

## B.    Preliminary Injunction

The Board may petition a federal district court "for appropriate

temporary relief or restraining order" pending the Board's resolution of an unfair

labor practice charge, and the district court has "jurisdiction to grant to the Board

such temporary relief or restraining order as it deems just and proper."  29 U.S.C. §

160(j).  In granting temporary relief, the court must keep "in mind that the

underlying purpose of Section 10(j) is 'to protect the integrity of the collective

bargaining process and to preserve the Board's remedial power while it processes

the charge.'"  *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir.

2010) (quoting *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr*, 19 F.3d 449, 459-60

(9th Cir. 1994) (en banc)).

In determining a motion for temporary relief pursuant to § 10(j) of the

NLRA, the court must "consider the traditional equitable criteria used in deciding

whether to grant a preliminary injunction [] and employ the Supreme Court's

recent interpretation of the threshold showing necessary for granting such an

'extraordinary remedy.'" *Id.* (quoting *Winter v. Natural Res. Def. Council*, 129 S.

Ct. 365, 374-76 (2008)); *see also Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008)

("A preliminary injunction is an extraordinary and drastic remedy [that] is never

awarded as of right." (citation and quotation signals omitted)).  Specifically, "a

party seeking a preliminary injunction 'must establish that he is likely to succeed

on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest.'" *McDermott*, 593 F.3d at 957 (quoting *Winter*,

129 S. Ct. at 374).

## IV.  DISCUSSION

### A.    Motion to Dismiss

Respondents argue that the Petition should be dismissed for lack of

subject matter jurisdiction because it was not properly approved or authorized by

the Board.  Specifically, 29 U.S.C. § 160(j) provides that "[t]he Board shall have

the power, upon issuance of a complaint as provided in subsection (b) of this

section charging that any person has engaged in or is engaging in an unfair labor

practice, to petition any United States district court . . . for appropriate temporary

13

relief or restraining order."

At the end of December 2007, however, the Board was faced with losing two members, dropping its number below the three-member quorum. *See* Resp't Ex. A. Accordingly, despite § 160(j)'s recitation that the Board has the power to bring a petition for injunctive relief, on December 28, 2007, the Board delegated its authority to authorize and initiate the filing of § 160(j) petitions to the Board's General Counsel. Respondents thus argue that the Petition is improper because the Board did not authorize its filing and the Board's attempt to delegate its authority to file § 160(j) petitions to the General Counsel was improper. The court disagrees.

The Board made this delegation of authority to the General Counsel pursuant to 29 U.S.C. § 153(d) of the NLRA, which provides that the General Counsel:

> shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, *and shall have such other duties as the Board may prescribe or as may be provided by law*.

(emphasis added). Every court that has addressed this issue has found that § 153(d) permits the Board to delegate its power to seek § 160(j) relief to the General Counsel. *See Muffley v. Spartan Mining Co.*, 570 F.3d 534, 540 (4th Cir.

2009) (citing *Kentov v. Point Blank Body Armor, Inc.*, 258 F. Supp. 2d 1325, 1329

(S.D. Fla. 2002)); *Penello v. Int'l Union, UMWA*, 88 F. Supp. 935, 937 (D. D.C.

1950); *Evans v. Int'l Typographical Union*, 76 F. Supp. 881, 888-89 (S.D. Ind.

1948)); *see also Overstreet v. El Paso Disposal, L.P.*, 668 F. Supp. 2d 988, 1000

(W.D. Tex. 2009) (discussing cases and finding that "the Board's delegation to the

General Counsel of its section 10(j) authority is permissible"); *Glasser v.

Heartland -- Univ. of Livonia, MI*, 632 F. Supp. 2d 659, 662 (E.D. Mich. 2009)

(joining "other districts in holding that § 3(d) of the NLRA, 29 U.S.C. § 153(d),

allows the Board to delegate its § 10(j) authority to the General Counsel").

Respondents make the same argument that was rejected by these

courts -- that § 153(d) allows the Board to delegate only certain "duties," but not

the "power" to bring a § 160(j) petition.  In finding that § 153(d) permits the Board

to delegate to the General Counsel the authority to seek a § 160(j) petition, one

court reasoned:

> "The provision that the General Counsel shall have 'such
> other duties as the Board may prescribe' must mean
> necessarily that the Board may confer upon the General
> Counsel functions other than those specifically
> committed to him by statute; otherwise, it would be
> 'superfluous and without meaning or purpose.'"  [*Int'l
> Typographical Union*, 76 F. Supp. at 888-89.]
> Moreover, "since these 'other duties' which the Board
> may prescribe for the General Counsel are obviously not
> duties which relate to functions he already has under the

> statute, they necessarily are functions which are
> expressly or impliedly lodged with the Board." *Id*. at
> 889.

*Muffley ex rel. NLRB v. Massey Energy Co.*, 547 F. Supp. 2d 536, 540 (S.D. W.Va.

2008), *aff'd by Massey Energy Co.*, 570 F.3d 534.  Courts have further explained

that the Board may delegate the authority to bring a § 160(j) petition because it is a

prosecutorial function, as opposed to a core adjudicative function that may not be

delegated.  *See Massey Energy Co.*, 570 F.3d at 540; *see also El Paso Disposal,*

*L.P.*, 668 F. Supp. 2d at 1000 (finding that "requesting section 10(j) relief is a

prosecutorial tool and not an adjudicative function that the Board is prohibited

from delegating").

 The court agrees with the reasoning of these courts and finds that the

Board lawfully delegated to the General Counsel, pursuant to § 153(d), its

authority to bring a §160(j) petition such that court has jurisdiction over the

Petition.  The court therefore DENIES Respondents' Motion to Dismiss.

## B. Preliminary Injunction

 Petitioner asserts that the court should issue the requested injunction

because he will likely succeed on the merits before the Board, the Union and Hotel

employees will suffer irreparable harm in the absence of preliminary relief, the

balance of equities tips in favor of injunctive relief, and an injunction is in the

public interest.  The court considers the arguments on each of these inquiries.

### 1.   *Likelihood of Success on the Merits*

Likelihood of success on the merits "is defined by whether the Board would adopt the findings and recommendations of the ALJ and whether, in that event, [the Ninth Circuit] would conclude that the Board's order should be enforced." *McDermott*, 593 F.3d at 964; *see also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286-87 (7th Cir. 2001) (stating that "the court's inquiry is confined to the *probability* that the Director will prevail").

The Ninth Circuit has provided that likelihood of success is proven in § 10(j) cases where there is "some evidence to support the unfair labor practice charge together with an arguable legal theory." *Stephen Dunn & Assocs.*, 241 F.3d 662, 664 (9th Cir. 2001) (quotations omitted).  Petitioner asserts, and Respondents dispute, that this more lenient standard applies despite the Supreme Court's mandate that a plaintiff seeking injunctive relief must establish that it is likely to succeed on the merits.  *Winter*, 129 S. Ct. at 374-76.  The court need not resolve this dispute, however, because, as explained below, Petitioner has met the higher *Winter* standard of showing that it will likely succeed before the Board and the Ninth Circuit in proving that Respondents violated 29 U.S.C. § 158(a)(1), (3) and (5).

a.      *Whether HTH, PBC, and Koa are a single employer*

Petitioner asserts that HTH, PBC, and Koa are in fact a single

employer.

"The single employer doctrine allows the Board to treat related

enterprises as one employer within the meaning of § 2(2) of the NLRA, 29 U.S.C.

§ 152(2) [(defining "employer")].  The doctrine is frequently used so that the

Board can assert its jurisdiction over employers which, taken separately, would fall

below the Board's self-imposed jurisdictional minimum."  *C.E.K. Indus. Mech.*

*Contractors, Inc. v. NLRB*, 921 F.2d 350, 353 (9th Cir. 1990) (citations omitted);

*see also A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33*, 869 F.2d 514,

517-18 (9th Cir. 1989).

"Single-employer status ultimately depends on all the circumstances

of a case and is characterized by the absence of an arm's-length relationship found

among unintegrated companies."  *In re Mercy Hosp. of Buffalo*, 336 NLRB 1282,

1284 (2001) (citations and quotation signals omitted).  In determining whether

separate entities constitute a single employer, the Board applies four factors:

"(1) interrelation of operations, (2) common management, (3) centralized control

of labor relations, and (4) common ownership or financial control."  *RBE Elecs. of*

*S.D.*, 320 NLRB 80, 80 (1995); *see also S. Prairie Constr. Co. v. Local 627, Int'l*

*Union of Operating Eng'rs*, 425 U.S. 800, 802 n.3 (1976) (quoting *Radio Union v. Broad. Serv. of Mobile. Inc.*, 380 U.S. 255, 256 (1965)).  While no single factor is controlling and all factors need not be present to support a single employer finding, "the Board has held that the first three factors are more critical than the last, and, further, that centralized control of labor relations is of particular importance because it tends to demonstrate 'operational integration.'"  *RBE Elecs. of S.D.*, 320 NLRB at 80; *see also NLRB v. Carson Cable TV*, 795 F.2d 879, 882 (9th Cir. 1986) (citations omitted); *see also In re Mercy Hosp. of Buffalo*, 336 NLRB 1282, 1284 (2001).

  Based upon a consideration of these factors, the court finds that the Board will likely determine, and the Ninth Circuit would likely affirm, that Respondents are a single employer.

  First, the entities at issue share both common ownership and management.  HTH, PBC, and Koa are all owned by the Hayashi family.  *See* Pet'r Ex. C, I:71.  PBC is a wholly owned subsidiary of HTH, and HTH and PBC formed Koa only to satisfy the requirements of a lender.  *Id.* at I:68, 83-85, 91.  Further, the officers of HTH and PBC are "essentially the same" -- Watanabe and Hayashi are members of the Board of Directors for both companies, *id.* at I:71-2, 75, 89, Watanabe is also the special member of Koa, and Minicola is the Regional

Vice President of Operations for HTH and PBC.  *Id*. at I:67, 85.  In fact, neither

HTH nor Koa has any employees of its own.  *Id*. at I:85.

Given this significant overlap of officers and executives, it is clear

that operations of these entities -- to the extent HTH and Koa have "operations"

without employees -- are interrelated.  Further, Respondents produced no

documents in response to subpoenas seeking information that would indicate

separate locations such as rental or lease agreements for office space.  *See* Pet'r Ex.

D at GC54, GC55, GC56.

Finally -- and most importantly -- Petitioner has presented evidence

that these entities share a centralized control of labor relations.  All of these entities

are insured under the same liability and workers compensation insurance policies,

Pet'r Ex. C at II:1331-43, and Minicola has decision-making authority on all labor-

related issues for all of these entities.  *Id.* at I:77-78; *see also Asher Candy, Inc.*,

348 NLRB 993, 994 n.1 (2006) (finding centralized control of labor relations

where one company paid insurance, deducted union dues, and funded the payroll of

other company); *Bristitzky*, 323 NLRB 524, 524-25 (1997) (finding single

employer where one individual controlled labor relations decisions for all entities).

In opposition, Respondents provide no argument, and indeed, did not

address this issue before the ALJ.  *See HTH Corp.*, 2009 WL 3147894, Pet'r Ex. G

at 4.  Accordingly, based on the evidence and record presented, the court finds that the Board will likely determine and the Ninth Circuit will affirm that HTH, PBC, and Koa are a single entity.

>    b.    *Whether Respondents violated their duty to bargain in good faith from January to December 2006*

Petitioner asserts that Respondents failed to bargain in good faith with the Union from January through December 2006 in violation of 29 U.S.C. §§ 157 and 158.

Section 158(a)(1) of the NLRA provides that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  In turn, § 157 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."  29 U.S.C. § 157.  Finally, § 158(a)(5) provides that an employer's refusal "to bargain collectively with the representatives of his employees" is an "unfair labor practice."  In sum, these provisions create a duty for employers to bargain in good faith with the collective bargaining representative.

"Ascertaining compliance with the duty to bargain in good faith

21

generally requires inquiry into an employer's motive or state of mind during the bargaining process" and "must be determined from an examination of the totality of circumstances." *Seattle-First Nat'l Bank v. NLRB*, 638 F.2d 1221, 1225 (9th Cir. 1981); *see also Pub. Serv. Co. of Okla. (PSO)*, 334 NLRB 487, 487 (2001); *Chevron Chem. Co.*, 261 NLRB 44, 45 (1982).  While the content of bargaining proposals may suggest bad faith, "inferences drawn from those proposals are not alone sufficient to support a finding of a violation of the obligation to bargain in good faith." *Seattle-First Nat'l Bank*, 638 F.2d at 1226.  The Board may, however, consider proposals to determine whether a party is simply going through the motions without any intention of reaching an agreement.  *In re Altorfer Mach. Co.*, 332 NLRB 130, 143 (2000).  Evidence indicative of bad faith may also include "delaying tactics, unreasonable bargaining demands, unilateral changes in mandatory subjects of bargaining, efforts to bypass the union, failure to designate an agent with sufficient bargaining authority, withdrawal of already agreed-upon provisions, and arbitrary scheduling of meeting[s]." *Atlanta Hilton & Tower*, 271 NLRB 1600, 1603 (1984).

  The evidence presented establishes a likelihood that the Board will find and the Ninth Circuit will affirm that Respondents engaged in unfair bargaining tactics from January through December 2006.  From November 29,

2005 through December 14, 2006, Mori and Minicola met for a total of 37

sessions, Pet'r Ex. D at GC3 ¶ 1, and reached 171 tentative agreements.  *Id*. at

GC17.  While this evidence on its own might suggest that Minicola negotiated in

good faith with the Union, Minicola's positions during negotiations belie any effort

to come to a final agreement.

Throughout negotiations, Minicola took a firm stance on requiring

certain provisions that would effectively deprive the Union of its certification and

bargaining power.  Specifically, Minicola proposed the following Union

Recognition clause that gave control of the bargaining unit to Respondents:

> [t]he employer has and shall maintain at any and all times
> its sole and exclusive right to unilaterally and arbitrarily
> change, amend, and modify the verified bargaining unit
> set forth in Case 37-RC-4022, and all hours, wages,
> and/or other terms and conditions of employment at will.

Pet'r Ex. D at GC24.  Minicola further proposed that the Union have no input

regarding workers' conditions of employment:

> 1.A.a  The Hotel has and shall retain the sole and
> exclusive right to manage its operation and direct its
> work force at will . . . .  It is expressly recognized that
> such management rights, powers, authority and functions
> include, but are not limited to, the right to select, hire,
> discipline and discharge employees at will; transfer,
> promote, reassign, demote, layoff and recall employees;
> establish, implement, and amend rules and regulations,
> and policies and procedures; . . . determine and change
> the duties of each job classification; add or eliminate job

classifications; determine and change the nature and scope of operations; determine and change the nature of services to be provided and establish the manner in which the Hotel is to be operated; and any and all other functions of management. The Union shall not abridge these rights or any residual rights of management. The Union shall not directly or indirectly oppose or otherwise interfere with the efforts of the Hotel to maintain and improve the skill, efficiency, ability and production of its work force, the quality of its product, or the method and facilities of its services.

1.A.b It is agreed and understood between the parties hereto that the management rights, powers, authority, and functions referred to herein shall remain exclusively vested in the Hotel except insofar as specifically surrendered by express provisions contained in this Agreement.

*Id.* As a final example, Minicola also demanded employee grievance procedures that gave the General Manager the final say as opposed to a neutral third party, and did not allow for arbitration. *Id.*

Minicola never changed his position on these terms, including them in his final proposal to the Union. *Id.*; Pet'r Ex. C at I:235-36; Mori Aff. 2-3. While Minicola is entitled to take hard positions in bargaining, *see Atlanta Hilton & Tower*, 271 NLRB at 1603, Minicola's actions show bad faith bargaining -- he insisted on provisions that "would exclude the labor organization from any effective means of participation in important decisions affecting the terms and conditions of employment of its members." *United Contractors, Inc.*, 244 NLRB

24

72, 73 (1979); *see also Modem Mfg. Co.*, 292 NLRB 10, 11 (1988) (stating that the

employer "sought to effectively destroy the Union's capacity for resolving disputes

on the unit employees' benefits [and that] the [employer's] insistence that it retain

the ability to deal directly with the unit employees strikes at the very heart of the

Union's representative function to bargain collectively on behalf of the unit

employees").

       Evidence of Minicola's animus toward the Union further supports the

court's conclusion that Respondents engaged in bad faith bargaining during the

calendar year 2006. *See A-1 King Size Sandwiches, Inc.*, 265 NLRB 850, 858

(1982) (concluding that evidence "consisting primarily of Respondent's bargaining

proposals and positions, but also viewed in the light of statements indicative of

Respondent's attitude toward collective bargaining, is sufficient to establish that

Respondent entered into bargaining with no real intention of concluding a final and

binding collective-bargaining agreement").  Beyond Minicola's untenable

positions, at every negotiation session Minicola "point[ed] out, as a reminder,

[that] the [U]nion had only won by one vote."  Pet'r Ex. C at II:226-27.  Given that

over 25% of the employees did not vote, Minicola asserted that at least half, if not

more, of the employees did not want to be represented by the Union and he was

concerned for these employees.  Pet'r Ex. C at II:226-27; Minicola Decl. ¶ 8.

Believing Minicola's statements untrue, the bargaining committee members circulated an employee petition, which showed that a majority of employees supported the Union.  Pet'r Ex. C at II:225-27.  Despite this evidence of Union support, Minicola refused to change his position.  *Id.*  Further, during negotiations with Outrigger executives, Minicola stated that Watanabe was upset with the employees for voting for the Union, and that Respondents would move to decertify the Union at the end of the certification year in 2006.  *Id.* at II:1049-50; Pet'r Ex. D at GC77.  Accordingly, to the extent that Minicola's bargaining positions left any doubt of bad faith bargaining, his animus toward the Union confirms that he had no intention of entering into a CBA with the Union.

In opposition, Respondents assert that Minicola referenced the one-vote majority for the Union only to emphasize that a significant percentage of Hotel employees did not want to pay Union dues and did not want to be represented by the Union.  *See* Minicola Decl. ¶ 10.  Minicola continued to raise this point, however, even after he was presented with the employee petition supporting the Union.  Further, even if Minicola were concerned about the minority of employees who did not support the Union, this concern does not explain his insistence on the management rights, Union recognition, and employee grievance provisions.  Rather, the evidence taken as a whole supports the

conclusion that Minicola never had any intention of agreeing to any CBA with the Union. *See, e.g.*, Ex. C I:414-15; 4:507.

Accordingly, based on the evidence presented, the court finds that Petitioner has shown a likelihood of success that the Board will conclude and the Ninth Circuit will affirm that Respondents bargained in bad faith during the calendar year 2006.

> c.   *Whether Respondents engaged in bad faith bargaining from January 2007 through November 2007*

In September 2006, Koa and PBHM signed the MA for PBHM to take over "the marketing, operation, direction, maintenance, management, and supervision of all portions of the Hotel," effective January 2007. Pet'r Ex. D at GC38; *Id*. at I:239. Both Respondents and PBHM told the Union that in light of the MA, PBHM and not Respondents was the employer of the Hotel employees. Despite these assertions, the ALJ found that "although Respondents contractually delegated PBHM to run the Hotel and to bargain collectively with the Union on Respondents' behalf [during this time], at no time were Respondents relieved of the obligation to bargain in good faith with the Union" and that Respondents engaged in bad faith bargaining during this time period. *See* Pet'r Ex. G at 43 ¶ 8.

The ALJ came to this conclusion by finding that Respondents were the "true employer" of the Hotel staff during this time. *Id.* at 16. Petitioner has

filed a limited cross-appeal requesting that the Board make an explicit finding of

agency.  As explained below, the court does not reach whether the Board will

determine that Respondents were the "true employer," but rather concludes that the

Board will find and the Ninth Circuit will affirm that PBHM was an agent of

Respondents for purposes of negotiating a CBA, and that Respondents never

intended to permit PBHM to enter into a CBA with the Union.

        i.      Respondents' and PBHM's principal/agent relationship
              as to CBA negotiations

An "employer" for purposes of the NLRA "includes any person acting

as an agent of an employer, directly or indirectly."  29 U.S.C. § 152(2).  The

NLRA further provides that "[i]n determining whether any person is acting as an

'agent' of another person so as to make such other person responsible for his acts,

the question of whether the specific acts performed were actually authorized or

subsequently ratified shall not be controlling."  29 U.S.C. § 152(13).

The Board applies common law agency principles to determine the

existence of an agency relationship.  *See, e.g., Tyson Fresh Meats, Inc.*, 343 NLRB

1335, 1336 (2004).  An agency relationship may therefore exist between a

purported agent and principal where the agent possesses either actual or apparent

authority to act on the principal's behalf: "actual authority refers to the power of an

agent to act on his principal's behalf when that power is created by the principal's

manifestation to him.  That manifestation may be either express or implied."  *Id.*

(quoting *Commc'n Workers Local 9431 (Pacific Bell)*, 304 NLRB 446 n.4 (1991).

Petitioner has presented evidence from which the Board will likely

conclude and the Ninth Circuit will affirm that PBHM was simply acting as

Respondents' agent for purposes of negotiating the CBA.  Respondents, through

the MA, gave PBHM express authority to negotiate a CBA with the Union.  *See*

Pet'r Ex. D, GC38 ¶ 3.3(e).  Despite the MA's assertion that PBHM "is an

independent contractor, and nothing in this Agreement or in the relationship of

[Respondents and PBHM] shall constitute a partnership, joint venture, agency, or

other similar relationship," *see* Pet'r Ex. D, GC38 ¶ 3.1, Respondents retained

ultimate control over the negotiations.  Specifically, the MA required PBHM to

obtain Respondents' approval prior to entering into any CBA:

> Operator shall obtain Owner's approval of any agreement
> affecting the Hotel (i) the term of which is more than one
> (1) year in length and that cannot be terminated upon
> thirty (30) days' notice by Operator, or (ii) if the cost to
> the Hotel under that agreement exceeds Three Hundred
> Fifty Thousand Dollars ($350,000.00), or (iii) that
> extends beyond the Initial Term and cannot be terminated
> upon thirty (30) days' notice by Operator.

*Id.* at ¶ 3.2.c.  Section 3.2.c of the MA effectively gave Respondents veto power of

any proposed CBA between PBHM and the Union -- given the long term

negotiations with the Union, PBHM was not interested in a CBA for less than one

29

year because it "would hardly give [PBHM] . . . a [] stable period to develop

relationships with the employees and [] to operate the business."  Pet'r Ex. C at

I:409.  Additionally, a one-year collective bargaining agreement would cost the

Hotel more than $350,000, requiring Respondents' approval.  *Id.* at I:410.

Indeed, despite Minicola's and PBHM's outward statements to the

Union that HTH was no longer operating the Hotel, PBHM worked under the

assumption that Koa -- as the Hotel's "owner" -- must approve any CBA between

PBHM and the Union.  For example, both Wilinsky and Rand sent letters to

Respondents, seeking Koa's approval on proposals to the Union, which PBHM

believed would result in a CBA.  Pet'r Ex. D at GC39, GC44, GC45.  Wilinsky

explained to Watanabe that "[PBHM] cannot bargain in good faith with the Union

until and unless [it] receive[s] [Koa's] consent."[3]  *Id.* at GC45.

In opposition, Respondents suggest that the MA was a "typical

management agreement" under which PBHM operated as the owner and employer

at the Hotel.  Resp't Supp. Br. 4-5.  The court rejects this argument.  While

Respondents may have hoped to create the appearance that PBHM was not the

Hotel's employer, the MA was not "typical" but rather allowed Respondents to

---

[3]  The court's conclusion is confirmed by Respondents' decision to cancel the MA only four days after PBHM sought their approval of contract terms that would have resulted in a CBA.  As explained below, it appears that Respondents canceled the MA to prevent the Union from learning of its role in negotiations.

retain control over the Union negotiations, creating the principal-agent relationship described above.

In sum, the record supports that while Respondents certainly attempted to distance themselves from the Union negotiations by using PBHM as the "official" operator of the Hotel, PBHM's control was illusory because Respondents held the ultimate authority over Union negotiations.  Accordingly, the Board will likely find and the Ninth Circuit will affirm that the MA did not vest to PBHM Respondents' employer status but instead merely made PBHM Respondents' agent.[4]

      ii.      Respondents' bad faith bargaining during this time period

On August 3, 2007 -- four days after PBHM sought its approval of contract terms which would have resulted in a CBA -- Respondents canceled the MA with PBHM.  Based upon the record presented, Petitioner asserts that Respondents never had any intention of allowing PBHM to enter into a CBA with

---

[4]  The court recognizes that the ALJ did not make an agency determination and instead found that Respondents were the "true" employers of the Hotel employees.  The ALJ's "true employer" language does not change the court's analysis.  Petitioner alleged in its Conformed Complaint that PBHM served as Respondents' agent within the meaning of 29 U.S.C. § 152(13) for the purposes of engaging in collective bargaining with the Union and operating the Hotel.  Pet'r Ex. A at 7 ¶ 2(m)(ii).  Further, implicit in the ALJ Decision's finding that Respondents were the true employers is that PBHM was acting on Respondents' behalf during this time period.  Given that Petitioner seeks a limited cross-appeal seeking an agency determination, the court finds that on the record presented, the Board will likely make and the Ninth Circuit will affirm this determination.

the Union and canceled the MA to prevent Respondents from having to reject the proposed CBA and/or disclose its veto power over the CBA to the Union.  The court agrees that the Board will find and the Ninth Circuit will affirm that Respondents engaged in bad faith bargaining over this time period by having PBHM negotiate with the Union while at the same time knowing that it would never approve any CBA.

The evidence establishes that Minicola clearly did not want a CBA with the Union, much less any Union presence at the Hotel.  During initial negotiations, Minicola told PBHM that Watanabe was upset with the employees for voting for the Union, and that Respondents would move to decertify the Union at the end of the certification year in 2006.  Pet'r Ex. C at II:1049-50; Pet'r Ex. D at GC77.  Rather than move to decertify the Union, Respondents entered into the MA with PBHM, who was well aware that Minicola was "very unhappy" with the concept of a CBA.  Pet'r Ex. D at GC39.

The terms of the MA required that it be kept confidential, and the Union was not aware of its language giving Respondents veto power over a CBA. PBHM nonetheless negotiated with the Union and by June 29, 2007, the parties were close to entering into an agreement with only "a few issues outstanding."  *Id.* Respondents were aware that a CBA was imminent -- PBHM told Respondents of

this progress and even requested direction given its understanding that

Respondents did not want a finalized CBA.[5]  *Id.*  By letter dated July 30, 2007,

PBHM asked Koa, as "owner" under the MA, to consent to PBHM providing the

MA's contract approval provision to the Union (along with other provisions as

well), and that Koa approve 11 specific proposals for the CBA.  *Id.* at GC44.

PBHM explained that if it made these 11 proposals, the Union would accept them

and the parties would likely enter into a CBA.  *Id.*  PBHM further asserted that if

Respondents refused to consent, Respondents would be in breach of the MA and

that PBHM would no longer be able to bargain in good faith with the Union.  *Id.*;

*see also* GC 45.  PBHM received no response from Respondents.  Instead, on

August 3, 2007, Respondents terminated the MA, effective December 30, 2007.

*Id.* at GC46.

        At the time Respondents canceled the MA, they were faced with some

hard decisions regarding PBHM and the Union.  They could reject PBHM's

proposals and allow PBHM to disclose the MA's contract approval provision to the

Union, but then the Union would know of Respondents' involvement and authority

on Union negotiations.  Alternatively, Respondents could have approved the

---

[5]  Rand's understanding that Minicola was opposed to a CBA is fully consistent with
Minicola's anti-Union bias.  *See supra* § IV(B)(1)(b).

33

proposals, but then the Union would be on the verge of a CBA -- the very result

Respondents had been trying to avoid since negotiations began in 2006.  The third

alternative -- to cancel the MA and purport to take over the Hotel operations as a

new employer -- avoided both of these results.  Given the facts presented, it

appears that Respondents canceled the MA simply to derail the final stages of the

Union negotiations and prevent the Union from learning of its role in negotiations

over this time period.  Accordingly, the Board will likely find and the Ninth Circuit

will affirm that Respondents engaged in bad faith bargaining during this time

period.

In opposition, Respondents provide no explanation why they

terminated the MA except for a vague reference to "performance issues," *see*

Minicola Decl. ¶ 32, which, from the record, may refer to PBHM's delay in

installing Stellex, PBHM's failure to keep occupancy rates up, PBHM's changes to

projected performance figures, disputes over fees and commissions, and the fish

deaths in the aquarium.  The record does not support that these excuses are valid

reasons for terminating the MA.

As to the delay in installing Stellex, Outrigger's proprietary property

management and reservation system, it was eventually installed and properly

operating within the Hotel by May 2007.  Pet'r Ex. C at I:379-83.  Further,

Minicola had worked at Outrigger for 15 years and was familiar with the Stellex system, *id*. at III:2244, 2310, such that he should have anticipated that installing Stellex takes significant effort. *Id.* at III:2293-98.

As to PBHM's projected occupancy rate and performance figures, Respondents asserted before the ALJ that PBHM did not perform up to par with its projections, yet Minicola testified that the decline in the Hotel's occupancy was in part due to the decline in the tourism economy. *Id*. at I:390; III:2274. Moreover, Wallace explained during the time PBHM was managing the Hotel, profits "were in excess of [PBHM's] projections and considerably in excess of the prior year's operations." *Id*. at I:390-91; III:2309.

As for PBHM's changes to projected performance figures, the MA required PBHM to submit a formal budget to Respondents within 90 days of the start of its management of the Hotel. *Id*. at III:2279. PBHM submitted a preliminary budget in a timely fashion, and Respondents approved PBHM's request to extend the time allotted to PBHM to prepare a formal budget, allowing PBHM enough time to acquire knowledge of how the property operates. *Id*. at III:2279-81. Once PBHM finished its formal budget, PBHM revised its projected performance figures to take into account the formal budget. *Id*. at III:2282, 2285-86. These changes were therefore in line with basic budgeting principles and not a

35

basis for termination.

Regarding the fees and commissions, Respondents and PBHM had disagreements regarding the 1.5% chain service fee PBHM proposed to charge Respondents for providing services to the Hotel and the 2.5% commission Respondents wanted to charge PBHM on all Japanese wholesale business.  Pet'r Ex. C at I:378, 383-85, III:2276, 2303-08.  The parties resolved these disputes, however, with Respondents accepting the 1.5% charged to the Hotel after PBHM explained the basis for this charge, *id.* at I:383-84, and PBHM continuing to pay the 2.5% commission to Respondents.  *Id.* at I:385, III:2057, 2316.

Finally, as for the dead fish in the aquarium, it is unclear whether Respondents truly assert this problem as a reason for terminating the MA because Minicola did not identify it as a reason in his affidavit before the ALJ.  *Id.* at III:2276.  In any event, PBHM apparently addressed this issue by meeting with the chief engineer to stabilize the oxygen in the tank and replacing the dead fish.  *Id.* at III:2041-44.

In sum, Respondents' alleged reasons for terminating the MA are unsupported.  The Board will likely find and the Ninth Circuit will affirm that Respondents engaged in bad faith bargaining by allowing PBHM to negotiate with the Union while at the same time knowing that they would never approve a CBA,

and then canceling the MA simply to derail the negotiations between the Union

and PBHM and hide their position as Hotel employer.

> d.  *Whether Respondents unlawfully withdrew recognition from the Union and refused to bargain*

Petitioner argues that Respondents unlawfully withdrew recognition

of the Union in December 2007.

The Union enjoyed a rebuttable presumption of majority support, and

Respondents' withdrawal of recognition establishes a prima facie case of unlawful

refusal to bargain.  *NLRB v. Mar-Len Cabinets, Inc.*, 659 F.2d 995, 998 (9th Cir.

1981).  In *Levitz Furniture Co. of the Pacific*, 333 NLRB 717, 725 (2001), the

Board rejected a good-faith doubt standard[6] and instead held that "[a]n employer

may rebut the continuing presumption of an incumbent union's majority status, and

unilaterally withdraw recognition, only on a showing that the union has, in fact,

lost the support of a majority of the employees in the bargaining unit."  The

employer must prove loss of majority status at the time of withdrawal "by a

preponderance of the evidence," making the showing with "objective evidence that

the union has lost majority support."  *Levitz Furniture Co.*, 333 NLRB at 725.

"Objective" evidence does not refer to the "force" of the evidence, but

---

[6]  Before *Levitz Furniture Co.*, an employer could "withdraw recognition on the basis of good-faith doubt (either uncertainty or disbelief) concerning the union's continued majority support."  *Levitz Furniture Co. of the Pac.*, 333 NLRB 717, 723-24 (2001).

rather its "source." *See Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359,

367-68 n.2 (1998). Objective evidence may include, for example, "a petition

signed by a majority of the employees in the bargaining unit." *Levitz Furniture*

*Co.*, 333 NLRB at 725; *see also Midwest Television, Inc.*, 349 NLRB 373, 377

(2007) (finding that the Respondent withdrew union recognition based on an

untainted showing of majority disaffection through a decertification petition);

*Lexus of Concord, Inc.*, 343 NLRB 851, 851-52 (2004) (finding that a letter from a

majority of employees rejecting the Union, along with a decertification petition

"privileged the Respondent's withdrawal of recognition if no legal barrier

precluded reliance on it"). Even with such evidence, however, an employer

"withdraws recognition at its peril" because it still has "to prove by a

preponderance of the evidence that the union had, in fact, lost majority support at

the time the employer withdrew recognition." *Levitz Furniture Co.*, 333 NLRB at

725.

  Applying this framework, the Union enjoyed a rebuttable presumption

of majority support and Respondents have the burden of presenting evidence

showing that the Union had in fact lost majority support when it withdrew

recognition in December 2007. Minicola asserts that he decided to withdraw

Union recognition based on: (1) discussions with many Hotel employees that a

majority of employees did not want to be represented by the Union; (2) the lack of employee participation in Union rallies; (3) oral and written comments that Respondents received indicating lack of Union support; and (4) comments made by Hotel employees to the media suggesting a lack of Union support.  Minicola Decl. ¶ 33; *see also* Fishel Decl. ¶ 8; Morimoto Decl. ¶ 8; Kringel Decl. ¶¶ 7-8; Nagasako Decl. ¶¶ 8-9.

This subjective, conclusory evidence is insufficient to show that the Union had in fact lost majority support in December 2007.  Respondents had no petition, much less any factual confirmation that a majority of its employees did not support the Union.  Rather, Respondents decided to withdraw Union recognition based on conjecture, speculation, and assumptions derived from Minicola's observation of Union rallies and the comments by some employees.  This evidence is simply not persuasive; otherwise, "a few antiunion employees could provide the basis for withdrawal of recognition."  *See Golden State Habilitation Convalescent Ctr.*, 224 NLRB 1618, 1619-1620 (1976); *see also Bolton-Emerson, Inc.*, 293 NLRB 1124, 1129 (1989); *La.-Pac. Corp.*, 283 NLRB 1079; *Redok Enters.*, 277 NLRB 1010 (1985).

In opposition, Respondents argue that the Board may remand the matter to the ALJ because Respondents were not permitted to submit employee

testimony regarding their anti-union sentiments or evidence of a July 10, 2008 anti-Union petition signed by a majority of the employees.  Considering this evidence, however, does not change the court's analysis.  While the evidence from employees may be relevant to show that Respondents had a good faith belief that the Union lacked support, *Levitz* rejected the good faith standard and instead requires objective evidence that the Union has in fact lost majority support at the time of withdrawal.  Further, the July 10, 2008 Petition is irrelevant because it does not address whether the Union "lost majority support at the time the employer withdrew recognition," that is, in December 2007.[7]  *See id.* (requiring majority loss at time of withdrawal).

The court therefore finds that based on the evidence presented, the Board will likely find and the Ninth Circuit will affirm that Respondents unlawfully withdrew recognition from the Union in December 2007.

---

[7] Respondent further argues that the July 10 anti-Union petition is competent evidence to rebut the presumption of taint pursuant to *Lee Lumber & Building Material Corp.*, 322 NLRB 175, 177 (1996).  This argument, however, ignores the relevant inquiry -- whether the Union in fact lost majority support at the time Respondent withdrew recognition on December 1, 2007.  Because the July 10, 2008 anti-Union petition does not reflect majority support on December 1, 2007, it is simply irrelevant under the *Levitz* framework.  Further, the NLRB maintains a "well-established policy that employers may not withdraw recognition in a context of serious unremedied unfair labor practices tending to cause employees to become disaffected from the union."  *Levitz Furniture Co.*, 333 NLRB at 717 n.1.

e.   *Whether Respondents discharged seven employees to discourage Union activity*

In August 2007, HTH began its application process for determining which Hotel employees would be rehired once Respondents took over operations from PBHM on December 1, 2007. Pet'r Ex. C at I:278. Respondents separated applications by department as well as classification and assert that they made the hiring decisions based on six criteria: attendance, attitude, flexibility, job performance, customer service, and team work. *Id*. at II:1120-23, 1585. As of November 30, 2007, 34 bargaining (Union member) employees and 15 non-bargaining (non-Union member) employees were not offered positions at the Hotel. Pet'r Ex. E at Resp't 16, 17, 18, 19.

Petitioner argues that Respondents unlawfully terminated five[8] bargaining committee members, Darryl Miyashiro ("Miyashiro"), Ruben Bumanglag ("Bumanglag"), Rhandy Villanueva ("Villanueva"), Virginia Recaido ("Recaido"), and Virbina Revamonte ("Revamonte"), due to their union involvement. The court outlines the relevant framework and then applies this framework to the facts presented.

---

[8] Petitioner also argues that the Board will likely affirm the ALJ Decision that Keith Kanaiaupuni and Todd Hatanaka were unlawfully terminated. Because these individuals have been rehired at the Hotel, however, the court need not address them in determining the appropriate injunctive relief.

i.    Framework

The NLRA makes it an unfair labor practice for an employer  "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ."  29 U.S.C. § 158(a)(3).

To determine the employer's motivation in discharging an employee, "the General Counsel must make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's action."  *In re Caruso Elec. Corp.*, 332 NLRB 519, 522 (discussing *Wright Line*, 251 NLRB 1083 (1980)).  "The elements commonly required to support such a showing [that protected conduct was a motivating factor] are union or protected activity by the employee, employer knowledge of that activity, and union animus on the part of the employer."  *Intermet Stevensville*, 350 NLRB 1270, 1274 (2007). If this initial showing is made, "the burden then shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's union activity."  *Id.* (citing *Manno Electric*, 321 NLRB 278, 280 n.12 (1996)).

ii.    Application

Based on the record presented, the Board will likely find and the

Ninth Circuit will affirm, that Petitioner has established his prima facie case of

unlawful termination as to each of these five employees.

First, each of these employees, despite long service records with the

Hotel, was terminated during Respondents "rehiring" process.  For example,

Bumanglag was a maintenance first class employee at the Hotel for almost 12

years, Pet'r Ex. C at II:809, Recaido was a full-time Housekeeping employee for

15 years, *id*. at II:728, 731, 737, and Revamonte held a full-time pantry position at

the Hotel for 15 years.  *Id*. at II:846-48.  Miyashiro was employed by the Hotel for

15 years and was the senior-most member of the banquet staff, but was the only

banquet wait help employee not offered a position.  *Id*. at I:585, 624-26.  Similarly,

Villanueva had been a housekeeping employee at the Hotel for almost 14 years, but

was the only houseman not rehired in December 2007.  *Id*. at II:761, 787.

Second, each of these employees was an active Union participant.  All

of them were on the Union negotiating committee representing various

departments.  *See id*. at I:597, 611-12 (Miyashiro); *id*. at II:818-19 (Bumanglag);

*id*. at II:737, 775-76 (Villanueva); *id*. at II:728, 731, 737 (Recaido); *id*. at II:853,

860 (Revamonte).  Beyond their official roles in the Union, these employees

43

engaged in other Union activities such as participating in rallies and the Union's information booths. *See, e.g.*, *id.* at I:609, 632; II:777, 787-88; II:821, 853, 860. In addition, Miyashiro, Revamonte, and Bumanglag all made statements to the media supporting the Union, *id.* at I:632, II:733-35, 819-20, and Miyashiro and Bumanglag passed out fliers in the community. *Id.* at II:819. Finally, both Bumanglag and Revamonte participated as Union observers in two representation elections and hearings. *Id.* at II:818-19, 853, 863.

Third, Respondents were fully aware of these employees' Union activities. Minicola, as negotiator for the Respondents, sat across from these individuals at the bargaining table. *See, e.g., id.* at I:611-12; II:824. Moreover, Minicola not only observed Union events, *id.* at I:154, but also took photographs of them. *Id.* at I:155-58.

Fourth, the record provides ample evidence of Respondents' animus toward the Union. As described above, this animus is apparent from Minicola's previous untenable positions during negotiations, Minicola's overt statements regarding his dislike for the Union, and Respondents' termination of the MA to prevent PBHM from entering into a CBA with the Union. If there was any doubt about Respondents' feelings about these employees, Minicola clarified them when he asserted in front of Recaido that members of the negotiating committee would

not be employed if it were not for the goodness of Watanabe.  *Id*. at II:754-55.

After the terminations, Minicola confessed to an employee that negotiating

committee members were not rehired due to both business and personal reasons.

*Id*. at I:674-78; II:921.

Given this direct evidence of Minicola's reasons for terminating these

employees, Respondents have an uphill battle showing that they would have

terminated these employees regardless of their Union activities.  Respondents have

not carried that burden.

As an initial matter, Respondents assert that because they became the

new Hotel employer on December 1, 2007, they did not actually terminate any

employees, but rather simply determined which employees to hire in the first

instance.  Resp't Opp'n 30-31.  As explained above, however, the court rejects that

Respondents relinquished their employer status to PBHM because Respondents

maintained ultimate control over the negotiations with the Union.  Accordingly,

regardless of how Respondents characterize their more active role in Hotel

operations beginning on December 1, 2007, Respondents' decision not to hire

individuals is still subject to the framework outlined above.

Further, even addressing the explanations Respondents provided

before the ALJ for terminating these employees (Respondents failed to provide any

specific reasons supported by evidence in its briefing to this court), they do not establish that Respondents would have taken the same actions regardless of these employees' Union activity.

Respondents asserted that Miyashiro was a negative employee who started a dangerous fire in November 2006 and bullied another banquet department employee. *Id.* at II:1130-31, 1313-14. This explanation appears to be nothing more than an after-the-fact excuse. The bullying incident did not result in disciplinary action, but instead was simply reported to management with no apparent action taken. *Id.* at II:1313-14. Further, when the fire occurred -- which Miyashiro claims was an accident resulting from tossing what he thought was an extinguished sterno can into the trash -- Respondents acknowledged that Miyashiro was a "good worker" and signed a disciplinary action form affirming that the incident would not be used against Miyashiro in the future. *Id.* at I:594-95, 600, 605-6; II:1135; Pet'r Ex. E at Resp't 7.

As for Bumanglag, Respondents alleged that he was not rehired because he was not flexible in scheduling, was inconsistent in his work, and did not properly repair kitchen equipment, which allegedly resulted in injury to an assistant sous chef. Pet'r Ex. C at II:1150-52, 1387-89. Bumanglag claims he had only been disciplined once since 1998, however, and Respondents presented no

evidence that he was ever disciplined for failure to perform his job properly.  *Id*. at

II:816, 839, 1321-22.

Respondents alleged that Villanueva failed to complete assignments,

committed safety violations, and had poor attendance.  *Id*. at III:1653, 1656-58.

Indeed, Villanueva was suspended once and received warnings for his absenteeism.

*Id*. at II:763-64.  Despite these warnings and suspension, however, Villanueva

received multiple service awards for his housekeeping abilities and performance.

*Id*. at II:766, 787.  Further, it appears that Respondents made their "hiring"

decision on Villanueva without following their own procedures -- the notification

letters for housekeepers were all dated October 12, 2007, three days before

Christine Ko ("Ko"), the Executive Housekeeper, met with Linda Morgan

("Morgan"), the Corporate Director of Human Resources, to discuss housekeeping

terminations.

Respondents alleged that Recaido was terminated because she had a

poor attitude, was not a team player, was insubordinate, and had a poor attendance

record, *id*. at II:1605, but were unable to present any evidence of any disciplinary

action ever being taken against Recaido.  *Id*. at II:1607-08.  Moreover, similar to

Villanueva, the Board will likely find and the Ninth Circuit will affirm that

Respondents already selected which housekeeping employees would be offered a

position prior to receiving Ko's recommendations.

The last employee, Revamonte, presents a closer case.  At the time Respondents were conducting their "rehiring" process, Revamonte was on leave due to an industrial injury she suffered in June 2006 and was receiving disability and workers' compensation benefits.  *Id*. at II:846-48, 869-71.  According to Respondents, Revamonte's application for rehire was not processed because she was neither on the schedule nor available for immediate work.  *Id*. at II:1128, 1391.  While this reason on its face appears valid, Respondents hired another housekeeper who was also on leave and receiving worker's compensation.  *Id*. at III:1686-87; Pet'r Ex. D at GC63.  Given that Revamonte's circumstances parallel those of a housekeeper that was rehired, Respondents' explanation does not prove that they would have terminated Revamonte regardless of her Union activities.

In sum, the record supports Petitioner's prima facie case of unlawful termination as to each of these employees and Respondents have failed to show that they would have terminated these employees regardless of their Union activities.  Accordingly, based on the record presented, the Board will likely find, and the Ninth Circuit will affirm, that Respondents terminated the five employees discussed above in violation of 29 U.S.C. § 158(a)(3).

f.      *Whether Respondents changed terms and conditions of employment in violation of the NLRB*

Petitioner argues that Respondents unlawfully changed the

employees' terms and conditions of employment.

"[A]n employer violates sections 8(a)(1) and 8(a)(5) of the [NLRA] if

it makes a unilateral change in a term or condition of employment -- so-called

'mandatory subjects' of bargaining -- without first bargaining over the relevant

term." *Local Joint Executive Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1075 (9th

Cir. 2008); *see also NLRB v. Katz*, 369 U.S. 736 (1962).  The mandatory subjects

of bargaining include "wages, hours, and other terms and conditions of

employment."  29 U.S.C. § 158(d).

After announcing that Respondents were going to take over operations

of the Hotel from PBHM, the Union attempted to bargain with Respondents, but

was told to wait until December 1, 2007 when Respondents officially became the

employer.  *See, e.g.*, Pet'r Ex. C at I:276-77.  On December 1, 2007, however,

Respondents withdrew recognition of the Union.  *Id.*  During this time,

Respondents also made a number of changes to the terms and conditions of

employment of Hotel employees including, for example, wage increases for certain

groups, Pet'r Ex.C at I:136; fewer management positions and reduced staffing, *id.*

at 1:120, and former full-time employees being rehired on a part-time or an on-call

basis.  *Id*. at 1:139.  Because Respondents made these changes without negotiating

with the Union -- and indeed, refused to bargain at all with the Union during this

time period -- Petitioner has shown a likelihood of success in proving to the Board

that Respondents violated 8(a)(1) and 8(a)(5) of the NLRA.

### 2.    *Irreparable Harm*

As explained above, Petitioner has shown a likelihood of success in

proving that Respondents engaged in a long-term effort aimed at preventing the

Union and Respondents from entering into a CBA, dissuading employees from

supporting the Union, and terminating the Union in its entirety.  The court

therefore determines whether Hotel employees and the Union will suffer

irreparable harm if an injunction does not issue.[9]

"Irreparable harm may be established under § 160(j) if an employer's

*continued* unlawful conduct will dissipate union support and weaken the union to

such a degree as to threaten its prospective ability to bargain and render moot any

future NLRB remedial action."  *Overstreet v. W. Prof. Hockey League, Inc.*, 2009

WL 2905554, at *8 (D. Ariz. Sept. 4, 2009).  In other words, the court "must take

into account the probability that declining to issue the injunction will permit the

---

[9] Although the Ninth Circuit previously held that where the Petitioner demonstrates that it is likely to prevail on the merits, the court should presume irreparable injury, *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994), the court no longer presumes irreparable injury in light of *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365 (2008).

allegedly unfair labor practice to reach fruition and thereby render meaningless the [NLRB's] remedial authority." *Miller*, 19 F.3d at 460.

Gone unchecked, Respondents' actions will cause irreparable harm to both the Hotel employees and the Union. As to the employees, Respondents' refusal to bargain represents a lost opportunity for collective bargaining, which is irreparable "because a future order to bargain with the Union is 'a forward-looking order [that] cannot fully compensate the employees . . . for the variety of benefits that good-faith collective bargaining with the Union might otherwise have secured for them in the present.'" *Peck v. Horizons Youth Servs.*, 2009 WL 2381761, at *11 (quoting *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001)); *see also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable.").

As to the Union, Respondents' refusals to bargain in good faith and the institution of unilateral changes to the terms and conditions of employment are causing additional harm. Specifically, Respondents' acts "send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them." *NLRB v. Hardesty Co.*, 308 F.3d 859, 865 (8th Cir. 2002); *see also Morio v. N. Am. Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980) (revoking

certain unilateral changes in employment conditions based upon a finding that the

union's prestige and legitimacy with its members had been severely eroded by the

respondent's conduct, which included unilateral changes).  The Union's inability to

act on behalf of Hotel employees in turn may cause employees to "drift away"

from the Union.  *See Brown ex. rel. NLRB v. Pac. Tel. & Tel. Co.*, 218 F.2d 542,

544 (9th Cir. 1954) ("In view of the irreparable harm which the designated unions

may suffer by the drifting away of their members . . . we think the law entitles the

Board to the injunctive relief sought."); *see also Norelli v. SFO Good-Nite Inn*,

2007 WL 662477, at *14 (N.D. Cal. Mar. 1, 2007) (finding irreparable harm

because "Respondent's conduct would impair the employees' rights under the Act

by causing an erosion of support from the Union, by impairing the effectiveness of

the Union, by making it difficult to enforce union rules and regulations, and by

making it difficult to preserve the collective bargaining process.").

Further, Respondents' termination of active union supporters "'risks a

serious adverse impact on employee interest in unionization and can create

irreparable harm to the collective bargaining process.'"  *Pye ex rel. N.L.R.B. v.

Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001) (quoting *Asseo v. Pan Am.

Grain Co.*, 805 F.2d 23, 27 (1st Cir. 1986)); *see also Blyer v. P&W Elec., Inc.*, 141

F. Supp. 2d 326, 330 (E.D.N.Y. 2001) (finding reinstatement appropriate to

prevent risk of chilling union efforts).  As attested to by Labitingao and Kamada,

while a majority of employees have voiced support for the Union through

confidential support cards, the Union is losing open employee support because

employees are scared of losing their jobs and facing reprisals.[10]  *See* Labtingao

Decl. 4-5; Kamada Decl. 4-5.  This "chilling effect" on the Union and "fear of

employer retaliation after the firing of union supporters is exactly the 'irreparable

harm' contemplated by § 10(j)."  *Id.* (citing *Asseo v. Centro Medico Del Turabo*,

900 F.2d 445, 454 (1st Cir. 1989); *see also Electro-Voice, Inc.*, 83 F.3d at 1572.

The five terminated employees want to return to the Hotel, and their return will

help to reverse the chilling effect that their unlawful termination caused.

Beyond these harms identified above, Petitioner also asserts that the

Union and employees will be irreparably harmed if the court does not return the

parties to their most recent bargaining positions by restoring the tentative

agreements reached between the Union and PBHM.  Pet'r Memo 56.  The court

agrees that in the absence of this relief, both the Hotel employees and the Union

---

[10]  The court recognizes that Respondents assert that they received and verified a July 2008 anti-Union petition.  Given that this anti-Union petition is subsequent to Respondents' numerous NLRA violations, this petition is likely tainted.  *See Lee Lumber & Bldg. Material Corp.*, 322 NLRB 175, 177 (1996) (stating that taint of a union's loss of majority support can be presumed where the employer previously unlawfully refused to recognize and bargain with the union).  Even if the July 2008 petition suggests, however, that a majority of employees truly no longer support the Union, then it is merely additional evidence that Respondents' actions are causing employees to drift away from the Union.

will be harmed.  In general, a "normal remedy for unlawful withdrawal of Union

recognition during bargaining [is requiring] the offending party to restore the status

quo ante by continuing to offer, for a reasonable period of time, proposals that

were outstanding at the time of the unlawful withdrawal of recognition." *Sunol*

*Valley Golf Club*, 310 NLRB 357, 357 (1993).  As explained above, the Board will

likely find and the Ninth Circuit will affirm that Respondents used PBHM to create

the appearance that they were no longer the Hotel employer for purposes of

negotiating a CBA and then terminated the MA after they were faced with the

alternatives of disclosing their control to the Union or allowing PBHM and the

Union to enter into a CBA.  Because PBHM was acting on Respondents' authority,

these tentative agreements represent agreements on behalf of Respondents.  To

ignore these tentative agreements would result in the parties starting negotiations

back at square one, a pyrrhic victory for the Union.  Requiring the parties to

renegotiate terms previously agreed on would only prolong the negotiations

process and cause additional harm to the employees and the Union.

In finding that the Hotel employees and the Union will be irreparably

harmed without an interim order, the court recognizes that Petitioner could have

sought this relief in this court in 2008 when the first Complaint was filed before the

Board. Whatever the reasons were for the delay,[11] this passage of time is not a bar to Petitioner showing irreparable injury -- "the factor of delay is only significant if the harm has occurred and the parties cannot be returned to the status quo or if the Board's final order is likely to be as effective as an order for interim relief." *McDermott*, 593 F.3d at 965 (quotations omitted).  Applying this principle, the delay in seeking interim relief is not significant because the harm in this action is ongoing.  As a result of Respondents' refusal to recognize the Union, employees are losing the opportunity for collective bargaining and Union representation, and the Union is losing active support due to its inability to bargain and employees' concern about retaliation.  The loss of active Union support and collective bargaining is in an ongoing harm and as more months pass, the ability of the Board's final order providing full relief diminishes.  An interim order will therefore stem the ongoing harm and ensure that the Board's final order provides some relief.

In opposition, Respondents argue that the facts in this action are "nearly identical" to *McDermott*, which affirmed a district court's finding of lack

---

[11]  Petitioner asserts that a § 10(j) petition was not filed earlier because additional charges against Respondents were added from December 26, 2006 through October 29, 2008, subpoenas needed to be issued after Respondents refused to cooperate by providing evidence, and Norelli believed it prudent to wait until after the ALJ Decision due to the complex and lengthy investigative and administrative proceedings.  Norelli Decl. ¶¶ 4, 5, 11.

of irreparable harm due to the passage of time.  593 F.3d at 965.  *McDermott* was

faced with the discreet issue of whether the district court abused its discretion in

denying a request for injunctive relief requiring a publisher to reinstate employees

it discharged for union activity directed at pressuring the newspaper's owner and

publisher to refrain from exercising editorial control over news reporting.  *Id.* at

953.  Because the injunctive relief sought raised First Amendment concerns, a

higher bar applied requiring "a particularly strong showing of likely success, and

of harm as well . . . ."  *Id.* at 958.  As to irreparable harm, *McDermott* found that

the district court did not abuse its discretion in finding that an interim order would

not give employees any genuine reassurance beyond a final Board order given the

long delay between the alleged violations and the request for relief.  *Id.* at 965.

       While this action involves an even longer period of delay, *McDermott*

does not compel a different result in this action.  *McDermott* held only that the

district court did not abuse its discretion in finding a lack of irreparable harm; it

does not stand for the proposition that a passage of time refutes irreparable harm

as a matter of law.  Further, unlike *McDermott*, this action does not implicate any

constitutional rights and the basic standard for equitable relief applies.  Also unlike

*McDermott*, this action involves long-term and systematic NLRA abuses that are

ongoing such that an interim order will help stem the irreparable injury pending a

final Board order.  Finally, to the extent that *McDermott* is at all similar because it involved a request to reinstate employees, the passage of time in this action does not change that this interim relief will be more effective than a final Board order. As more time passes, it becomes less likely that these discharged employees will return to the Hotel, which "may itself cause irreparable injury to the unionization effort."  *Excel Case Ready*, 238 F.3d at 75 (citing *Electro-Voice*, 83 F.3d at 1573; *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988); *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)).  At least as of today, however, the employees wish to return to the Hotel.  *See* Doc. No. 50, Yashiki Decl. Accordingly, the delay in time does not make injunctive relief any less necessary to prevent ongoing harm and ensure the effectiveness of a Board final order.

In sum, the court finds that the Union and employees will suffer irreparable harm if the court does not order Respondents to recognize and bargain in good faith with the Union, to cease changing the terms and conditions of employment without bargaining with the Union, to rescind those unilateral changes it has already instituted, to reinstate the wrongfully discharged employees, and to stop any further discharges of employees due to their Union support.

### 3.   *Balance of Hardships*

The hardships that the Union and Hotel employees will face without

injunctive relief are the same as the irreparable injuries discussed above.  In

comparison, the harm to Respondents is more limited -- coming to the bargaining

table with the Union, rescinding unilateral changes to employment terms and

conditions, and rehiring five employees.  These hardships are not onerous.  In fact,

Respondents have provided no explanation of whether and how these hardships

will impact them.

Rather, the only argument Respondents make is that injunctive relief

will cause harm to the Hotel employees because they have stated that they do not

want to be represented by the Union.  Resp't Opp'n 37.  Respondents' argument

lacks merit for a number a reasons.  First, this anti-Union petition carries with it a

presumption of taint given Respondents' numerous NLRA violations discussed

above.  *See Lee Lumber & Bldg. Material Corp.*, 322 NLRB 175, 177 (1996)

(stating that taint of a union's loss of majority support can be presumed where the

employer previously unlawfully refused to recognize and bargain with the union).

That this anti-Union petition is tainted is all but confirmed by the confidential

support cards, which show that a majority of employees still support the Union.

*See* Labtingao Decl. 4-5; Kamada Decl. 4-5.  Second, given Respondents' likely

violations of the NLRA, if a majority of the employees truly do not support the

Union, this loss of support can be attributed to these violations and not some

58

independent reason.  In sum, Respondents should not be permitted to evade the imposition of interim relief merely because their efforts at shutting down the Union are succeeding.  Accordingly, the court finds that this factor weighs in favor of Petitioner.

### 4.     *Public Interest*

"In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.  Thus, courts must consider the extent to which this interest is implicated under the circumstances of the particular case." *Miller*, 19 F.3d at 460; *see also Tomco Caburetor Co.*, 853 F.2d at 749 (stating that interim relief may be necessary "to protect the public interest in the integrity of the collective bargaining process because many months often pass before the Board actually renders its final order in an unfair labor practice proceeding").  As explained above, the harm to the Union and Hotel employees is ongoing; the court therefore recognizes the public interest in ensuring that the Board will still be able to provide relief at the time of its decision.

In opposition, Respondents argue that the relief requested is the same relief that the Board may grant such that an interim order will improperly usurp the Board's authority.  Resp't Opp'n 37-38.  This argument is disingenuous -- under

Respondents' logic, the court should never provide injunctive relief because the

Board will eventually determine the issue.  Such result is untenable.  Accordingly,

the court finds that the public interest supports injunctive relief.

### 5.    *Scope of Appropriate Relief*

At the conclusion of the March 8, 2010 hearing, the court ordered the

parties to meet with Magistrate Judge Leslie E. Kobayashi to discuss the scope of

an injunction, without prejudice to any objection by Respondents to the court's

overall determination that injunctive relief should be granted.  With the assistance

of Magistrate Judge Kobayashi, the parties were able to find agreement on several

terms of an injunction, *i.e.*, Nos. 1(a)-(d), 2(a), (d) and (e) below, and submitted

their positions of disagreement on injunctive relief to the court on March 22, 2010.

*See* Doc. No. 52.  The court therefore addresses Petitioner's requests for injunctive

relief on which the parties could not agree.

First, Petitioner requests that the injunction continue pending final

disposition of the matters before the Board.  Respondents oppose, arguing that an

injunction of indefinite duration is not appropriate because it would allow the

Board to delay issuing a decision.  *See* Doc. No. 52, Ex. A at 3.  Respondents

further argue that providing injunctive relief with no known end point could

effectively extend relief beyond what the ALJ had contemplated, because the ALJ

recommended only that the Board issue an order requiring that Respondents

recognize and bargain with the Union for one year from the date of the Board's

order. *Id.* at 7-8.

The court rejects Respondents' arguments.  The court grants

injunctive relief to maintain the status quo so that the Board may be able to grant

effective relief.  Given the egregious NLRA violations discussed above, the court

does not believe that granting injunctive relief limited in time will adequately

prevent dissipation of Union support and ensure that a future Board decision will

have any true effect.  Further, the Board will expedite review of the ALJ Decision

once the court enters a § 10(j) injunction, such that this injunction will be limited

in time even if its exact duration is unknown.  *See* NLRB Rules & Regulations §

102.94 (stating that once a § 10(j) injunction is entered, the action "shall be heard

expeditiously and the case shall be given priority by the Board in its successive

steps . . . over all other cases except cases of like character and cases under section

10(l) and (m) of the Act").

Second, Petitioner requests that the injunction order Respondents to

cease and desist from interfering with, restraining, or coercing employees in the

exercise of their rights guaranteed them by section 7 of the NLRA.  Respondents

generally agree to this relief, but request that any allegation of non-compliance be

subject to a court-ordered process "to avoid burdening the Court when the matter can be handled and resolved through the administrative process."  Doc. No. 52, Ex. A at 5.  The court rejects Respondents' request -- if there are violations of this Order, Petitioner is free to either raise the issue through the administrative process or with this court through contempt proceedings.

Third, Petitioner requests that the injunction require Respondents to resume contract negotiations from the point that PBHM left off, honoring all tentative agreements reached by both Respondents and the Union, and PBHM and the Union.  Respondents object, arguing that the injunction language should reflect that the parties may in good faith reopen negotiations on any tentative agreement that is affected due to a change in economic or other circumstances.  *Id.* at 6. Petitioner recognizes that a change in circumstance may be a valid reason to justify a proposal to change a tentative agreement, but is not willing to give Respondents "preapproval" to revisit specific tentative agreements.

Given that the parties agree that a change in circumstance or other valid reason may justify a proposal to change a tentative agreement, the court agrees with Respondents that the injunction should reflect this possibility.  If Respondents seek to revisit tentative agreements and Petitioner believes that Respondents lack good faith, the injunction does not prevent Petitioner from

seeking appropriate relief.

Fourth, Petitioner requests that the injunction require Respondents to offer, within five days of date of this Order, immediate interim reinstatement to the terminated employees discussed above to their former job positions, or if those positions no longer exist, to substantially equivalent positions, without prejudice to their seniority or any rights and privileges previously enjoyed.  In opposition, Respondents request that the injunction simply specify the particular position each employee will be offered.  *Id.* at 8-9.  The court rejects Respondents' proposal -- if the injunction does not specify that the employees are to return to their former job positions without prejudice to their seniority or rights, then Respondents could offer these terminated employees less desirable rights and privileges than what they previously enjoyed.

Fifth, Petitioner requests that the injunction require Respondents to convene the bargaining unit employees during working times and have a management official read the Order to them.  Respondents object, providing no reason for their position.  *Id.* at 10-11.  In light of Respondents' numerous violations of the NRLA and the Hotel employees' fear of openly supporting the Union, the court believes that this relief will help restore the Union support and enforce that Respondents will recognize and bargain in good faith with the Union.

Finally, Petitioner requests that the injunction require Respondents to file with the court and serve on Petitioner a sworn affidavit describing Respondents' compliance with this Order.  Respondents object, arguing that Petitioner will know if Respondents do not comply with the Order.  The court agrees with Respondents.  The relief granted in this Order is clear; if Respondents fail to comply with this Order, relief may be sought either through the administrative process or with this court.

Accordingly, pending final disposition of the matters pending before the Board, the court ORDERS that:

1.  Respondents HTH Corp., Pacific Beach Corp., and Koa Management, LLC  d/b/a/ the Pacific Beach Hotel cease and desist from:

    (a)  withdrawing recognition from the Union as the exclusive bargaining representative of the bargaining unit employees;

    (b)  refusing to recognize or bargain in good faith with the Union with respect to rates of pay, hours of employment and other terms and conditions of employment for its bargaining unit employees;

    (c)  discharging employees in order to discourage Union activities and membership;

    (d)  unilaterally changing the terms and conditions of employment of bargaining unit employees without first giving notice to, and bargaining with, the Union; and

    (e)  in any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by

Section 7 of the National Labor Relations Act.

2.     Respondents HTH Corp., Pacific Beach Corp., and Koa Management, LLC d/b/a/ the Pacific Beach Hotel take the following affirmative steps:

    (a)     upon request, recognize and bargain in good faith with the Union with respect to rates of pay, hours of work and other terms and conditions of employment covering bargaining unit employees;

    (b)     resume contract negotiations and honor all tentative agreements entered into from the point Respondents and the Union, and PBHM and the Union, left off negotiations on November 30, 2007, and if an understanding is reached, embody such understanding in a signed agreement; provided, however, that the parties may in good faith reopen negotiations on any tentative agreement that has been validly affected by a change in economic or other circumstances;

    (c)     by April 5, 2010, offer, in writing, immediate interim reinstatement to Ruben Bumanglag, Darryl Miyashiro, Virginia Recaido, Virbina Revamonte, and Rhandy Villanueva to their former job positions, or if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any rights and privileges previously enjoyed, displacing, if necessary, any workers hired or reassigned to replace them;

    (d)     immediately rescind, at the Union's request, any or all of the unilateral changes to bargaining unit employees' terms and conditions of employment as they existed prior to December 1, 2007;

    (e)     post copies of this Order and the Order entitled "Injunctive Relief Pursuant to 29 U.S.C. § 160(j)" at the Pacific Beach Hotel in all places where notices to employees are normally posted; maintain these postings during the National Labor

Relations Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the National Labor Relations Board reasonable access to the Pacific Beach Hotel to monitor compliance with this posting requirement; and

(f)     by April 8, 2010, convene the bargaining unit employees during working time at the Employer's facility, by shifts, whereupon a responsible management official, in the presence of a National Labor Relations Board Agent, will read to employees the court's separate-entered Order entitled "Injunctive Relief Pursuant to 29 U.S.C. § 160(j)."

## V.  <u>CONCLUSION</u>

In sum, the court DENIES Respondents' Motion to Dismiss for lack of subject matter jurisdiction.  The court further finds that Petitioner has carried its burden of showing that the likelihood of success on the merits, irreparable harm, the balance of hardships, and the public interest all weigh in favor of the court granting injunctive relief.  The court therefore GRANTS the Petition for Injunction Relief as stated in this Order.  The Clerk of Court is ordered to close this action.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 29, 2010.



 /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Norelli v. HTH Corp et al.*, Civ. No. 10-00014 JMS/LEK, Order: (1) Denying Respondents' Motion to Dismiss for Lack of Subject Matter Jurisdiction; and (2) Granting the Petition for Injunction under Section 10(j) of the National Labor Relations Act