IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOSEPH F. FRANKL, Regional Director of Region 20 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner,<br><br>vs.<br><br>HTH CORPORATION, PACIFIC BEACH CORPORATION and KOA MANAGEMENT, LLC, A Single Employer, d/b/a PACIFIC BEACH HOTEL,<br>Respondents.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIV. NO. 10-00014JMS/RLP<br><br>ORDER GRANTING IN PART AND DENYING IN PART PETITIONER'S AMENDED MOTION FOR ADJUDICATION AND ORDER IN CIVIL CONTEMPT AND FOR COMPENSATORY RELIEF |

## ORDER GRANTING IN PART AND DENYING IN PART PETITIONER'S AMENDED MOTION FOR ADJUDICATION AND ORDER IN CIVIL CONTEMPT AND FOR COMPENSATORY RELIEF

## I. INTRODUCTION

For nearly a decade, Waikiki's Pacific Beach Hotel (the "Hotel") has repeatedly ignored its responsibilities to comply with the National Labor Relations Act ("NLRA" or the "Act"). Petitioner Joseph F. Frankl[1] ("Petitioner"), Director of Region 20 of the National Labor Relations Board (the "Board"), has filed

---

[1] Joseph F. Frankl was substituted for his predecessor Joseph P. Norelli, as Regional Director of Region 20 of the National Labor Relations Board.

numerous complaints asserting that HTH Corp. ("HTH"), Pacific Beach Corp.

("PBC"), and Koa Management, LLC ("Koa") d/b/a/ the Hotel (collectively,

"Respondents") have engaged in a litany of violations of the Act -- for meddling

with, failing to recognize, and refusing to negotiate with the International

Longshore and Warehouse Union, Local 142, AFL-CIO (the "Union").  Despite

numerous orders finding that the Hotel has violated the Act, the National Labor

Relations Board (the "Board") asserts that Respondents continue to flout their

duties, including by ignoring this court's March 29, 2010 Injunction requiring

them to comply with the Act.  The Board argues, and the court agrees, that

sanctions are appropriate.

      The March 29, 2010 Injunction stemmed from Petitioner's allegations

that Respondents had committed various NLRA violations, which was pending

before the Board when Petitioner sought interim injunctive relief from this court

pursuant to § 10(j) of the NLRA, 29 U.S.C. § 160(j) (referred to herein as

"§ 10(j)").  On March 29, 2010, the court found that the Board would likely

determine, and be affirmed by the Ninth Circuit, that Respondents engaged in a

number of violations of the NLRA and that injunctive relief was necessary to

prevent irreparable harm to Respondents' employees and the Union (the "March

29, 2010 Injunction").  The March 29, 2010 Injunction therefore required

Respondents to, among other things, recognize the Union, bargain in good faith with the Union, reinstate several employees, and rescind unilateral changes made to the terms and conditions of employment.  *See Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176 (D. Haw. 2010).  On June 14, 2011, the Board largely affirmed the ALJ Decision, *see HTH Corp.*, 356 NLRB No. 182, 2011 WL 2414720 (June 14, 2011), and on July 13, 2011, Ninth Circuit affirmed this court's § 10(j) injunction. *Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011).

According to Petitioner, Respondents, along with Robert Minicola ("Minicola"), HTH's Regional Vice President and the Hotel's acting general manager and human resources manager, have violated numerous provisions of the court's March 29, 2010 Injunction.  Although coercive contempt is not available in light of the Board's June 14, 2011 Decision, Petitioner argues that compensatory contempt sanctions are appropriate.  Based on the following, the court GRANTS in part and DENIES in part Petitioner's Motion.

## II.  BACKGROUND[2]

Since the beginning of its drive to organize the Hotel's employees in 2002, the Union has faced opposition from Respondents.  A July 31, 2002 election

---

[2]  Because the facts regarding each alleged violation of the March 29, 2010 Injunction are detailed and specific, the court provides in the Background Section only a general overview of the parties and their previous disputes.  The court outlines in the Discussion section the facts and evidence regarding each alleged violation.

was overturned by the Board due to Respondents' coercive interrogation of

employees and maintenance of an overly broad no-solicitation policy. *HTH Corp.*,

342 NLRB 372 (2004).  In a second election on August 24, 2004, Respondents

challenged several ballots, resulting in the Board ordering those ballots to be

counted and the Union winning the election by one vote. *Pacific Beach Corp.*, 344

NLRB 1160 (2005).  On August 15, 2005, the Regional Director issued a

certificate of representation in favor of the Union.

After the Union was certified, Respondents continued their campaign

to derail the Union, forcing Petitioner to file Complaints against Respondents from

2007 through 2008, which resulted in a September 30, 2009 decision by

Administrative Law Judge ("ALJ") James M. Kennedy finding that Respondents

had committed numerous NLRA violations, followed by a June 14, 2011

affirmance by the Board. *See HTH Corp.*, 2009 WL 3147894 (NLRB Sept. 30,

2009).  While waiting for the Board decision, Petitioner filed a Petition for § 10(j)

relief, which resulted in the March 29, 2010 Injunction. *See Norelli*, 699 F. Supp.

2d at 1176.

The March 29, 2010 Injunction, attached as an Appendix to this

Order, required Respondents to cease and desist from (1) withdrawing recognition

of the Union; (2) refusing to bargain in good faith with the Union with respect to

rates of pay, hours of employment and other terms and conditions for bargaining

unit employees; (3) discharging employees in order to discourage Union activities

and membership; (4) unilaterally changing the terms and conditions of employment

of bargaining unit employees without first giving notice to, and bargaining with,

the Union; and (5) in any other manner interfering with, restraining, or coercing

employees in the exercise of the rights guaranteed them by the NLRA.  The March

29, 2010 Injunction further required Respondents to, among other things, (1)

recognize and bargain in good faith with the Union with respect to rates of pay,

hours of work and other terms and conditions of employment covering bargaining

unit employees; (2) resume contract negotiations and honor all tentative

agreements entered into from the point that negotiations were left off on November

30, 2007; (3) reinstate several employees, including, in particular, Rhandy

Villanueva; and (4) rescind, at the Union's request, any or all of the unilateral

changes to bargaining unit employees' terms and conditions of employment as they

existed prior to December 1, 2007.

　　　　　After the March 29, 2010 Injunction, Petitioner filed a new Complaint

against Respondents with the NLRB, and also sought in this court contempt

sanctions (the subject of this order) and another § 10(j) injunction (the subject of a

separate order, *see Frankl v. HTH Corp.*, Civ. No. 11-00451 JMS/RLP).  Given the

substantial overlap in factual issues between the contempt and § 10(j) issues, the parties agreed to delay full briefing on the contempt motion until trial transcripts in the NLRB action were completed.

In the meantime, however, on June 14, 2011, the Board largely affirmed the ALJ Decision, *see HTH Corp.*, 356 NLRB No. 182, which resulted in Petitioner withdrawing its original Motion for Contempt filed in this action -- the request for coercive sanctions was mooted by the Board decision.  On July 13, 2011, the Ninth Circuit affirmed the court's § 10(j) injunction.  *Frankl*, 650 F.3d at 1334.

On July 8, 2011, Petitioner filed his Amended Motion for Adjudication and Order in Civil Contempt and for Compensatory Relief.  On September 13, 2011, ALJ John J. McCarrick, after hearing sixteen days of testimony, issued a Decision finding that Respondents committed various violations of the NLRA (the same subject matter as the contempt issues in this action).  Respondents filed their Opposition to the Amended Motion for Contempt on September 19, 2011, and Petitioner filed his Reply on October 3, 2011.  A hearing was held on October 31, 2011.

///

///

### III.  <u>STANDARD OF REVIEW</u>

Civil contempt  "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)).  Although the contempt "need not be willful, [] a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order." *Id.* (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695); *see also Boink Systems, Inc. v. Las Vegas Sands Corp.*, 2011 WL 3419438, at *3 (D. Nev. Aug. 3, 2011) ("A few technical violations do not vitiate substantial compliance if a party has made reasonable efforts to comply." (citations omitted)).  Further, substantial compliance with the court order is a defense to civil contempt. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d at 695.

The party claiming civil contempt must demonstrate a violation of the court's order by clear and convincing evidence. *Id.*  Accordingly, the moving party must establish that "(1) that [the alleged contemnor] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *United States v.*

7

*Bright*, 596 F.3d 683, 694 (9th Cir. 2010) (quoting *Labor/Cmty. Strategy Ctr. v.*

*L.A. County Metro. Trans. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009)); *see also*

*F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) ("The standard

for finding a party in civil contempt is well settled: The moving party has the

burden of showing by clear and convincing evidence that the contemnors violated a

specific and definite order of the court.").

If the moving party meets this initial four-part test, the burden then

shifts to the alleged contemnor to demonstrate why it was unable to comply.

*Affordable Media, LLC*, 179 F.3d at 1239; *Stone v. City & Cnty. of San Francisco*,

968 F.2d 850, 856 n.9 (9th Cir. 1992).  In other words, the accused party must

"show [that it] took every reasonable step to comply."  *Stone*, 968 F.2d at 856 n.9

(citation omitted).  To assess whether an alleged contemnor has taken "every

reasonable step" to comply with the terms of a court order, the court can consider a

variety of factors, including, for example, whether the contemnor has a history of

noncompliance, and whether the contemnor failed to comply despite the pendency

of a contempt motion.  *See Stone*, 968 F.2d at 857.

"A court has wide latitude in determining whether there has been

contemptuous defiance of its order," *Gifford v. Heckler*, 741 F.2d 263, 266 (9th

Cir. 1984) (citations omitted); *see also Stone*, 968 F.2d at 856, and "retains

discretion to establish appropriate sanctions." *Bright*, 596 F.3d at 696.  Sanctions

for civil contempt may be imposed to coerce compliance with a court order and/or

to compensate the injured party for losses sustained.  *Koninklijke Philips Elecs.,*

*N.V. v. KXD Tech., Inc.*, 539 F.3d 1039, 1044 (9th Cir. 2008); *Whittaker Corp. v.*

*Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992) (citing *United States v. United*

*Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947)).  "Unlike the punitive nature

of criminal sanctions, civil sanctions are wholly remedial."  *Whittaker Corp.*, 953

F.2d at 517 (citation omitted).

## IV.  DISCUSSION

The March 29, 2010 Injunction required Respondents to refrain from

engaging in certain practices that violated the Act (such as refusing to bargain in

good faith with the Union, discharging employees in order to discourage Union

activities and membership, or unilaterally changing the terms and conditions of

employment of bargaining unit employees), as well as to take certain affirmative

steps to comply with the Act (such as bargain in good faith with the Union, resume

contract negotiations and honor all tentative agreements, and rescind unilateral

changes).  Petitioner argues that after the March 29, 2010 Injunction, Respondents

committed numerous violations of the Act, with these same alleged violations

constituting violations of the March 29, 2010 Injunction.  In a separate action,

*Frankl v. HTH Corp. et al.*, Civ. No. 11-00451 JMS/RLP, Petitioner sought a

§ 10(j) injunction for these most recent violations of the Act, which this court

granted on November 21, 2011 (the "November 21, 2011 Injunction").  Because a

violation of the Act may also constitute a violation of the March 29, 2010

Injunction, where appropriate, the court draws heavily from the November 21,

2011 Injunction.  The court first determines that Respondents should be held in

contempt and then turns to the issue of appropriate sanctions.

A.   **Whether Petitioner Has Established That Respondents Have Violated
     the March 29, 2010 Injunction**

The court addresses each of Respondents' alleged violations of the

Act in turn.

1.   *Discipline, Suspension, and Termination of Villanueva*

Petitioner argues that Respondents' discipline, suspension, and

termination of Villanueva violated several provisions of the March 29, 2010

Injunction.

a.   *Facts*

Villanueva was employed at the Hotel from May 1993 to November

30, 2007, and again from April 12, 2010 to July 28, 2010.  Joint Ex. A at 102.

Starting in 2003 until he was terminated in 2007, Villanueva served as a

Housekeeper II working the day shift, which entailed delivering linens, answering

10

guest calls, supporting the room attendant, and picking up trash at the end of the shift. *Id.* at 102-03, 106-07, 113, 185.  Both before and after his 2007 termination, Villanueva was an active Union participant -- he served as one of the original members of the Union negotiating committee, attended negotiating sessions between the Hotel and Union, attended Union meetings, and spoke with Hotel employees about the Union. *Id.* at 111-12.

The March 29, 2010 Injunction found that Petitioner established a likelihood of success in proving that Respondents violated the Act by discharging Villanueva for his Union participation, and therefore ordered Respondents to reinstate him. *Norelli*, 699 F. Supp. 2d at 1198-99, 1207.  As a result, on April 12, 2010, Respondents reinstated Villanueva as a Housekeeper II on the evening shift, with duties including cleaning and servicing rooms and delivering linen, towels, and other supplies to the housekeepers' supply closets.  Joint Ex. A at 113.  In comparison to his previous duties, Villanueva had not restocked the  housekeepers' supply closets since 2003 and had never cleaned rooms. *Id.* at 113-14.  As to training for his new duties, Villanueva shadowed a Houseman for one day, after which Villanueva worked alone. *Id.* at 116-17.

Shortly after his reinstatement, Villanueva was disciplined for his failure to follow various unwritten rules, which resulted in his termination on July

11

28, 2010.

i.      Placement of cases of toilet paper/production log incident

On May 20, 2010, Villanueva received a "written verbal warning"

from Human Resource Manager Margaret Yang ("Yang") regarding his failure to

properly store a case of toilet paper on April 27, 2010, and his failure to properly

complete his production log during the first week of May 2010.  *Id.* at 146-48.

As to the storage of the case of toilet paper, on April 27, 2010,

Villanueva had placed the case on the top shelf of a housekeepers' closet while he

was re-stocking.  *Id.* at 127-28, 432.  The top shelf is 60 and 5/8 inches from the

floor, and the case of toilet paper weighs 37 pounds, is 23 inches wide, 17 inches

high, and 18 inches deep.  *Id.* at 53, 307.  On April 28, 2010, Executive

Housekeeper Christine Ko ("Ko"), Housekeeping Supervisor Bobby Hind

("Hind"), and Housekeeping Manager Sandy Lam ("Lam") notified Villanueva

that when delivering toilet paper, he must not place it on the top shelf because it is

not safe.  *Id*. at 127-29, 432.  Villanueva explained that he had done so because

there was no room on the bottom shelf, and he did not want to leave the case on the

floor next to the bottom shelf, which would block the housekeeper's cart.  *Id.* at

129, 143, 335-36.  During the April 28, 2010 meeting, Ko told Villanueva that in

the future, if there is no room on the bottom shelf, he should make a notation on

the supply form and not deliver the case of toilet paper.  *Id.* at 131-32.  Villanueva was not told that he would be disciplined and did not again place cases of toilet paper on the top shelf of the housekeepers' closets.  *Id.* at 133, 135.

According to Villanueva, prior to the April 28, 2010 meeting with Ko, Lam, and Hind, he was not given any kind of written or verbal policy or procedure explaining where items should be stored in the housekeepers' closets; nor was he told that he should not place the box of toilet paper on the top shelf.  *Id.* at 130, 135, 137.  Further, both Villanueva and housekeeper Cherlene Saulin Wong testified that they recalled seeing a case of toilet paper on the top shelf in other housekeepers' closets on at least one occasion each.  *Id.* at 135-36, 347-48.  In comparison, Lam testified that Housemen are familiar with the practice of putting heavy items on the bottom shelf and are given instructions on how to stock the closets at the time of hiring.  *Id.* at 907; *see also id.* at 847-48 (housekeeper Lolita Lucas testifying that the toilet paper is always placed on the floor of the closet); 1044 (Houseman Larry Edrada ("Edrada") testifying that he places the toilet paper on the floor of the closet for safety reasons).

As to Villanueva's failure to properly complete his production log,[3]

---

[3]  A production log is a card an employee fills out while on shift documenting each particular room visited, the reason for the visit (*e.g.*, provide towels, service the room), and the times of the service.  *See, e.g.*, Joint Ex. B at GC Ex. 14; *see also* Joint Ex. A at 121 (Villanueva

(continued...)

13

during the first week of May 2010, Ko told Villanueva that instead of placing

checkmarks next to the room numbers he had completed servicing on his

production log, he should record the times he entered and exited a room.  *Id.* at

144.  Again, Villanueva had never been instructed to record the time he entered

and exited a room in his production log and had no indication that he was going to

be disciplined for his failure to properly complete the production log.  *Id.* at 126-

27, 143-44.  After receiving these instructions regarding his production log from

Ko, Villanueva complied.  *Id.* at 541-42; Joint Ex. B at GC14.

Despite the fact that Villanueva had not violated any written rules and

was not told of these "oral" rules before he was accused of violating them, on May

20, 2010, Villanueva received a written verbal[4] warning for "violation of safety

rules" and "failure to observe operating policies, procedures, and/or standards."

Joint Ex. B at GC3, p. 2.  During this May 20, 2010 meeting, Union Business

Agent Karl Lindo ("Lindo") asked why Hotel management had waited so long to

issue the warning and the rationale behind the warning, especially given that Yang

and Ko had already instructed Villanueva as to the proper placement of cases of

---

[3](...continued)
testifying that the production log is a small blue card which is "like a job order").

[4]  Although the "action taken" is identified as a "verbal warning," the warning is in
writing.

toilet paper, and Villanueva had followed their instructions.  Joint Ex. A at 432.

Ko responded that management wanted to put the warning in writing.  *Id.* at 433.

When Lindo asked Yang and Ko whether the warning was Hotel general manager

Minicola's decision -- who was fully aware of Villanueva's Union activity and has

spearheaded Respondents' efforts to derail the Union -- neither responded.  *Id.*

    ii.  Unauthorized access into the housekeeping office

   After receiving the written verbal warning, Villanueva was involved

in another incident regarding his access to the locked housekeeping office.

   The housekeeping office stores various items such as employee

contact information and personnel files, work schedules, assignment logs, and

guests' lost and found items, and is locked after 8:00 p.m.  *Id.* at 909-10.  On July

5, 2010, while working his 3:00 p.m. to 11:00 p.m. shift, Villanueva responded to

an employee call reporting that a guest had complained of a cockroach inside a

hotel room.  *Id.* at 157.  Villanueva went to the security desk where the keys for the

housekeeping office were kept, and asked Safety and Security Manager Eric

Hangai ("Hangai") for the keys so that he could retrieve "disinfectant."  *Id.* at 158-

59.  Although Villanueva did not say he needed to retrieve bug spray, Villanueva

speaks English as a second language and has consistently referred to sprays as

"disinfectant."  *Id.* at 150, 159-60, 228; *see also* Joint Ex. B at GC14, p. 42

(reflecting that on July 3, 2010, Villanueva wrote in his production log, "spray

disinfectant (Roaches)."); GC20, p. 3 (explaining to Minicola that he used

"disinfectant" on roaches).  Further, just two days prior on July 3, 2010, Villanueva

had accessed the security office to obtain bug spray without incident.  Joint Ex. A

at 154-56; Joint Ex. B at GC14, p. 42.  On that occasion, the Manager on Duty

("MOD") called Villanueva, notifying him about a cockroach in a guest room and

told him to go to security to request access to the locked housekeeping office to

obtain bug spray.  Joint Ex. A at 155-56.  Villanueva went to security officer

Bartolome, who handed him the key, and Villanueva used the key to unlock the

security office, get the spray, and used the spray on the cockroach.  *Id.*  Villanueva

then logged the use of the spray on his July 3, 2010 production log.  *Id.* at 156;

Joint Ex. B at GC14, p. 42.

    According to Hangai, although there is no written policy, he learned

through his work as a security officer that entry into the housekeeping office after

it was locked was allowed only by the MOD to access the lost and found.  Joint Ex.

A at 644-45.  Housekeeping manager Lam also testified that Villanueva was not

authorized to access the locked housekeeping office, and housekeeper Roselind

Mad ("Mad") and Edrada further explained that Housemen have no reason to enter

the locked housekeeping office because all the housekeeping supplies (which

16

apparently do not include bug spray) are kept in closets on each floor. *Id.* at 915, 1004, 1052-53. Because Villanueva referred to the bug spray as "disinfectant," however, Hangai testified that he assumed a chemical was needed for an emergency cleanup and did not contact the MOD before opening the housekeeping office. *Id.* at 640-41.

Hangai accompanied Villanueva to the housekeeping office, unlocked the office and let Villanueva inside, observing that Villanueva went directly to the cabinet and took a spray can. *Id.* at 647. Although Hangai looked at the spray can before allowing Villanueva to leave with it, he testified that he did not notice that it was an insecticide[5] and did not ask Villanueva what the spray was for. *Id.* at 648. After giving the spray can back to Villanueva, Hangai asked if Villanueva needed to log that he was taking the spray can; Villanueva responded that there was no log for the spray can. *Id.* at 161, 649. Hangai therefore made a notation in the security log regarding the entry into the housekeeping office. *Id.* at 661-62; *see also* Joint Ex. B at GC15, p. 3.

Villanueva testified that after entering the guest room and spraying the cockroach, he placed the spray can in his black housekeeping bag along with his

---

[5] The bug spray can was labeled "565 PLUS XO" in large letters with the phrase "Contact Insecticide" appearing in smaller letters directly under it. Joint Ex. B at GC12, GC12(a).

17

keys and radio at the end of his shift, and dropped the bag off at the housekeeping office before clocking out, as he does at the end of every shift.  Joint Ex. A at 266-67, 286-87.  Villanueva testified that he placed the spray can in the housekeeping bag because he felt Ko was watching him and thought that the bag was the safest place to leave the spray.  *Id.* at 409-10.

On the next day, on July 6, 2010, Hangai informed Ko that Villanueva had entered the office and removed a spray can of "565 Plus," and that Hangai had secured the office after Villanueva left.  *Id.* at 1173.  Ko said she was not aware of Villanueva's entry and would look into it.  *Id.*

On July 7, 2010, Ko notified Hangai that the spray can was missing from the housekeeping office.  *Id.* at 1173-74.  She also notified Hangai, after calling the manufacturer Orkin, that the "disinfectant" was commercial-grade insecticide, and that an employee had to be trained to use it, which Villanueva was not.  *Id.* at 1175-77.

        iii.    The July 12, 2010 suspension and the July 28, 2010 termination

On July 12, 2010, Ko notified Villanueva that he was being suspended without pay, pending an investigation.  Although Villanueva asked Ko why he was being suspended, Ko did not give Villanueva any specifics.  *Id.* at 149.

On July 20, 2010, the Union and Hotel held an investigatory meeting,

18

which was attended by Villanueva, Union representatives Brian Tanaka ("Tanaka")

and Eadie Omonaka ("Omonaka"), Minicola, Yang, Ko, and note keeper Lan Yao.

*Id.* at 1278-79; *see also* Joint Ex. C at Resp't Ex. 15.  The meeting started by

Tanaka asking Minicola to explain the subject matter of the Hotel's investigation

of Villanueva, Joint Ex. B at GC20, p. 1; Joint Ex. C at Resp't Ex. 15, p. 1, to

which Minicola responded that Villanueva was suspended pending investigation

regarding an infraction that occurred on July 5, 2010 and that they would not

discuss the nature of the infractions at this point.  Joint Ex. B at GC20, p. 1.

Minicola proceeded to ask Villanueva a series of questions including

whether anything unusual happened on his shift on July 5, 2010, whether

Villanueva asked security for the key to the housekeeping office, and how many

times he had accessed the housekeeping office since starting work on the night

shift.  Joint Ex. A at 1281-83; Joint Ex. B at GC20, pp. 1-2; Joint Ex. C at Resp't

Ex. 15, pp. 1-3.  Villanueva explained that he obtained access to the housekeeping

office to spray a cockroach with "disinfectant" in a guest room, that the MOD,

Mad, had instructed him to spray cockroaches on other occasions, and that he had

previously gained access to the housekeeping office.  Joint Ex. B at GC20, pp. 1-3.

Indeed, had Minicola reviewed Villanueva's production log, he would have seen

that Villanueva had sprayed "disinfectant" and/or serviced rooms for insects on at

19

least five occasions between April 21 and July 5, 2010.  Joint Ex. B at GC14, p. 12

("spray tub for ants"), 25 ("spray disinfectant"), 32 ("cacaroach [sic]"), 42 ("spray

disinfectant (Roaches)"), 45 ("spray dis/bugs").  Further, although not asked at this

meeting, Villanueva testified before ALJ McCarrick that he was unaware of any

requirement that he receive authorization to gain access to the housekeeping office

and that he had not dealt with a locked housekeeping office during his previous

tenure working the day shift.  Joint Ex. A at 172-73.

Minicola next asked Ko about the normal procedure for employees to

access the locked housekeeping office, and she answered that employees are

supposed to see the MOD and/or call a manager, and that requests for access occur

infrequently and only for emergencies.  Joint Ex. B at GC20, p. 3.  Ko further

explained that Villanueva did not call a MOD on July 5 or leave a note, and that

Villanueva was not trained to use the bug spray.  *Id.*  Minicola then brought Hangai

into the meeting and asked him questions about what happened when Villanueva

accessed the housekeeping office and whether Hangai thought the events of July 5,

2010 were unusual.  *Id.* at p. 4.  Hangai responded that he thought it was unusual

that Villanueva requested access to the locked housekeeping office because usually

only a supervisor or manager can make this request.  *Id.* at 5. Omonaka also asked

Hangai why he did not follow the purported proper procedure regarding access to

the housekeeping office, and Hangai provided no response.  *Id.* at p. 4; Joint Ex. A at 785-86.

At the conclusion of the meeting, Minicola stated that Villanueva was not logging what he was taking, that Villanueva should not be accessing the office, and that Villanueva may have stolen the can of bug spray.  Joint Ex. B at GC20, p. 6.  Minicola asserted that he was particularly concerned about Villanueva's use of the chemical bug spray and how he got access to it.  *Id.*  Minicola concluded the meeting by notifying Tanaka that he was unsure of what would happen and that the Hotel would make a decision on the discipline and notify the Union.  *Id.*

After the July 20, 2010 meeting, Minicola received a written incident report and statement prepared by Hangai, and a statement from Yang that the spray can was not found in the housekeeping bag.  Joint Ex. A at 1007-08, 1300. Minicola also received a written statement from Mad, asserting that she provided Villanueva deodorizer, not bug spray, on June 17, 2010.  Specifically, Mad's statement provided:

> On 6/17/10              Room 2151
> I (Rose) called Rhandy to spray room w/ deodorzer [sic].
> He ask where can I (Rhandy) get the spray[.]  I (Rose)
> said maids closet.  I (Rose) never give him 565 Plus to
> spray room.

Joint Ex. C at Resp't Ex. 26.  After collecting this additional information, Minicola

21

made the final decision to terminate Villanueva and notified Villanueva and Lindo

of this decision at a July 28, 2010 meeting.  Joint Ex. A at 1299-1302; Joint Ex. B

at GC-4, p. 1.

Villanueva's termination document states that he was terminated

based on his violation of the following House Rules:

> #1 - Falsification or giving misleading information on
> employment application or falsification of Company
> records or reports. . . .
>
> #2 - Theft or misappropriation of property (such as food,
> beverage or keys) . . . .
>
> #12 - Loitering or straying into areas not designed as
> work areas, or where your duties do not take you.
>
> #30 - Not reporting damaged or lost items belonging to
> the Company, guests, or outside agencies properties;
> refusing to cooperate with the Company in obtaining true
> and factual statements; dishonesty in any form.
>
> #42 - Not complying with your respective Departmental
> Rules and Procedures.

Joint Ex. B at GC 4, p. 1.

Although Minicola did not provide any explanation at the July 28,

2010 termination meeting as to how Villanueva violated these rules, Minicola

testified before ALJ McCarrick that he believed Villanueva had violated House

Rule #1 for falsifying statements by saying that (1) he had previously gotten the

bug spray from Mad; (2) he needed "disinfectant" rather than bug spray;

(3) Villanueva uses the bug spray all the time; (4) he left the bug spray in the black

housekeeping bag; and (5) he did not need to leave a note about what he took from

the housekeeping office.  Joint Ex. A at 70-72.  Minicola further explained that

Villanueva violated House Rule #2 when he failed to return the bug spray, and

violated House Rule #12 when Villanueva accessed the housekeeping office after

hours.  *Id.* at 72-73.  Minicola claimed that Villanueva violated House Rule #30

when he was dishonest about his statements to Hangai and other statements he

made during the investigation, characterizing Villanueva's statements as "vague,

evasive, and unresponsive."  *Id.* at 73.  Lastly, Minicola testified that Villanueva

violated House Rule #42 when he failed to get proper authorization to access the

housekeeping office, removed the bug spray from the office without logging it, and

sprayed an occupied guest room.  *Id.* at 73-74; 1325-26.

 Minicola admitted that he was previously unaware of any procedures

for accessing the housekeeping office, and was also unaware if anyone had

informed Villanueva regarding the access procedure.  *Id.* at 977, 1353-54.  Further,

although Hangai testified that he believed Ko claimed that some individuals were

trained to use the 565 Plus (the specific bug spray Villanueva used), *see id.* at 677,

Respondents did not present Ko to testify before ALJ McCarrick, none of

Respondents' witnesses has identified *any* specific individual trained to use the bug spray, and there is no evidence that anyone ever informed Villanueva that use of the bug spray required training. *Id.* at 677-78, 979-80, 1357-58. Finally, Minicola never reviewed Villanueva's production logs to determine whether they substantiated Villanueva's assertions that he had used bug spray on other occasions. *Id.* at 1364-65.

        b.    *Application*

Petitioner argues that the facts recited above establish by clear and convincing evidence that Respondents violated §§ 1(c) and 1(e) of the March 29, 2010 Injunction requiring Respondents to cease and desist from "discharging employees in order to discourage Union activities and membership," and "in any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the National Labor Relations Act." *See* Appendix (§§ 1(c) and 1(e) of injunctive language).[6] In other words, the March 29, 2010 Injunction ordered Respondents to refrain from violating §§ 8(a)(1) and 8(a)(5) of the Act, which make it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed

---

[6] Petitioner further argues that Respondents violated § 2(c) of the March 29, 2010 Injunction requiring Respondents to offer to reinstate several employees, including Villanueva. Given that Respondents did in fact reinstate Villanueva, there is no violation of the particular provision of the Injunction.

in section 157 of this title," 29 U.S.C. § 158(a)(1), or "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." *Id.* § 158(a)(3).[7]

As the court previously explained in its March 29, 2010 Injunction, *Norelli*, 699 F. Supp. 2d at 1197-98, to determine the employer's motivation in disciplining an employee, "the General Counsel must make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's action." *In re Caruso Elec. Corp.*, 332 NLRB 519, 522 (2000) (discussing *Wright Line*, 251 NLRB 1083 (1980)). "The elements commonly required to support such a showing [that protected conduct was a motivating factor] are union or protected activity by the employee, employer knowledge of that activity, and union animus on the part of the employer." *Intermet Stevensville*, 350 NLRB 1270, 1274 (2007). If this initial showing is made, "the burden then shifts to the employer to prove, as an affirmative defense, that it would have taken the same action even in the absence of the employee's union activity." *Id.* (citing

---

[7] In addressing whether Respondents violated the March 29, 2010 Injunction, both parties equated alleged violations of the March 29, 2010 Injunction to Respondents' obligations under the Act. The court agrees that provisions of the Act and their interpretations through caselaw provide a useful framework in addressing whether Respondents violated specific provisions of the March 29, 2010 Injunction.

*Manno Elec.*, 321 NLRB 278, 280 n.12 (1996)).

Petitioner has presented clear and convincing evidence that Villanueva's Union participation was a motivating factor in his discipline, suspension, and termination.  First, Villanueva was an active Union participant, promoting the Union even after he was terminated the first time in November 2007, and continuing his activities after he was reinstated in April 2010.  Joint Ex. A at 111-12; *see also Norelli*, 699 F. Supp. 2d at 1198 (describing Villanueva's participation on the negotiating committee and other Union activities); *HTH Corp.*, 2009 WL 3147894, at *27-28 (NLRB Sept. 30, 2009) (acknowledging that Villanueva served continuously on the Union's negotiating committee from 2005 to 2007).  Second, as outlined and specifically found in previous orders, Respondents were aware of Villanueva's Union activity and harbored great animus toward the Union, even terminating Villanueva once for his Union activity.  *See HTH*, 2009 WL 3147894 (finding that Respondents failed to rebut Petitioner's "prima facie case, fraught with animus"), *affirmed by HTH Corp.*, 2011 WL 2414720, at *2; *see also supra* (discussing the various Board decisions finding violations of the NLRA by Respondents).

And Respondents have not established that they would have taken these actions in the absence of Villanueva's Union activity.  Rather, the evidence

presented supports the singular inference that Respondents disciplined and ultimately terminated Villanueva based on rules (to the extent they actually existed) that were neither well-established nor known by Villanueva.

Indeed, as early as Villanueva's May 20, 2010 discipline for failing to properly stock toilet paper and fill out his production logs, it appears that Respondents were looking for reasons to discipline Villanueva and contoured the Hotel rules to suit their needs.  Specifically, as to Villanueva's stocking of the toilet paper on the top shelf of the housekeeping closet, Respondents provided Villanueva only one day of training when he began as Housekeeper II on April 12, 2010, Villanueva had last stocked the closets in 2003, and Villanueva was never told before the April 28, 2010 meeting that he should not place the toilet paper on the top shelf.  Simply put, the evidence supports a finding that Villanueva was not told -- and did not know -- that he should not place the toilet paper on the top shelf, making his May 20, 2010 discipline unwarranted.[8]

In opposition, Respondents assert that this discipline was appropriate in light of the safety concern created by placing the toilet paper on the top shelf -- Hotel employees testified that toilet paper should always be stored on the bottom

---

[8] Respondents claim that "[w]hen the Housemen are first hired, they are given instructions on how to stock the housekeeping closets."  Resp't Opp'n at 6-7.  Although this statement might be true generally, the specific evidence in this case demonstrates that Villanueva received no such training, and in any event he was first hired in 1993.

for safety concerns, and Villanueva even admitted that in retrospect, placing the toilet paper on the top shelf was not safe.  Joint Ex. A at 335.  This testimony does not change, however, that there were no written policies stating how to properly stock a housekeeping supply closet, and toilet paper had previously been placed on the top shelf.  Further, it is not a matter of common sense (as Respondents argue) that the toilet paper should be placed on the bottom shelf -- the box weighed only 37 pounds and was 23 inches wide, 17 inches, and 18 inches deep, and any housekeepers that felt unsafe retrieving the toilet paper could have called a Houseman for assistance.  *See* Joint Ex. A at 885-86.  In sum, although it was perfectly appropriate for Respondents to give Villanueva directions on how to stock the shelves, the facts presented provided Respondents absolutely no reason that would support a written disciplinary measure where Villanueva was not previously told the rules.  Accordingly, this incident evinces Respondents' animus towards Villanueva.

As to Villanueva's failure to record on his log the times he started and finished each guest room that he cleaned, Respondents do not even offer an explanation for why this incident warranted a verbal written warning.  Rather, the evidence presented establishes that Villanueva was not previously told to indicate the times on his log, and that others had similarly failed to denote the times on their

28

cards and received no discipline whatsoever.  *See* Joint Ex. B at GC21(A), A1-2, A30-31; GC21(B), B4-47; GC21(C), C5; GC21(D), D1-6.  Accordingly, the court concludes that this alleged violation of Hotel rules, like the toilet paper incident, appears to be due to Respondents' animus towards the Union such that Respondents would not have given Villanueva the written verbal warning but for his Union activity.

As to Villanueva's access to the housekeeping office and use of the bug spray, there was no question as to why Villanueva sought access to the housekeeper's office (to retrieve the bug spray), and no question as to what Villanueva took (Hangai visually confirmed that Villanueva had taken the spray can and marked this activity on his security log).  Villanueva's action of entering the housekeeping office can hardly be viewed as a violation of Hotel rules given that (1) Hangai, who purported to know the Hotel policy against access, allowed Villanueva access; (2) Respondents presented no evidence of any written policy regarding access to the housekeeping office; and (3) there is no evidence suggesting that Villanueva, who had previously worked the day shift when the office was open, knew of any Hotel policy that Housemen were not allowed access to the housekeeping office after it closes.  Further, there is ample evidence that despite any assertion by Respondents of a policy against spraying chemicals in

29

occupied guest rooms, *see* Joint Ex. A at 66, Housemen were not aware such policy existed. *See, e.g.*, *id.* at 152-57, 159-60, 1062.  Indeed, Villanueva had previously used bug spray in guest rooms on a number of occasions and indicated such use on his log, and was not corrected and/or disciplined.[9]  Joint Ex. B at GC14 pp. 12, 25, 32, 42.

Given that Villanueva's infractions of Hotel policies (to the extent those policies actually existed) were minor and at best caused by Respondents' failure to properly establish policies and/or train its employees, the clear and convincing evidence establishes that Villanueva's suspension and the following investigation and termination were based on Union animus, and that these actions would not have been taken by Respondents but for that animus.  That is, but for Villanueva's Union activity, Respondents would not have terminated him.

Indeed, Minicola's "investigation" and July 20, 2010 meeting bordered on farcical.  Minicola did not seek to determine whether the "rules" proffered by his managers were written (they were not), whether staff was informed of them (even Minicola admitted he was not aware of them), and whether Villanueva was told of them (he was not).  Instead, Minicola asked Villanueva a

---

[9]  Respondents apparently ignore all of these facts in asserting that "[b]ased on the record, it is very clear that Villanueva did not actually spray the 565 Plus in any of the guest rooms on the night of July 5, 2010."  *See* Resp't Opp'n 67.  Respondents' assertion is not supported by the record.

series of ambiguous questions without giving Villanueva any advance notice of the precise alleged rules violations at issue.  Minicola also gathered only the evidence that he knew would support a finding of rules violations by Villanueva -- Minicola relied on testimony and statements of his managers and did not review any objective evidence such as Villanueva's production logs.  Had Minicola reviewed Villanueva's production logs, he would have seen that Villanueva had documented his use of bug spray on several occasions, calling into serious question whether any of these "rules" that Villanueva allegedly violated actually existed.

Further, none of Minicola's explanations of the rules that Villanueva violated stands up to scrutiny; and these explanations certainly do not suggest that Minicola terminated Villanueva in good faith or that he took reasonable steps to comply with the March 29, 2010 Injunction.  Specifically, Minicola found that Villanueva had violated House Rule #1 by falsifying statements when he said that he (1) had previously gotten the bug spray from Mad; (2) eeded "disinfectant" rather than bug spray; (3) uses the bug spray all the time; (4) left the bug spray in the black housekeeping bag; and (5) did not need to leave a note about what he took from the housekeeping office.  These conclusions are simply not supported by the record.  If Minicola had only reviewed Villanueva's production logs, he would have seen that Villanueva sprayed for insects on several previous occasions,

31

referred to bug spray as "disinfectant" on his logs, and had logged that he sprayed on July 5.  Further, Villanueva's failure to leave a note stating what he took from the housekeeping office did not violate any Hotel rule that Respondents can point to, and leaving a note would appear redundant given that Hangai personally escorted Villanueva to confirm what was taken and Villanueva recorded spraying for bugs on his July 5, 2010 production log.  *Id.* at p. 45.

Minicola's (and now Respondents in their Opposition) assertions that Villanueva falsified statements only serves to highlight that Respondents were guided by the outcome they sought (terminating Villanueva) as opposed to the process (determining what really happened).  For example, as to Villanueva's statement that he had previously obtained bug spray from Mad, Mad provided Minicola a statement that on June 17, 2010, she provided Villanueva deodorizer, not bug spray, to use in a room.  Villanueva's production logs confirm this statement -- his production log on June 17, 2010 states "spray deodorizer" in room 2151.  *See* Joint Ex. B, GC Ex. 14, at 37.  As a result, it appears that Mad was asked to provide a statement regarding a date separate from when Villanueva asserts she provided him with the bug spray.  Further, Mad's statement that she "never give him 565 Plus to spray room," Joint Ex. C at Resp't Ex. 26, is ambiguous -- it is unclear whether Mad's statement means she never gave

32

Villanueva the bug spray on June 17, 2010 (as opposed to any of the other occasions he used the spray), or that she never gave him bug spray on *any* date. Given that Villanueva had sprayed for insects on multiple occasions, *see* Joint Ex. B at GC14 pp. 12, 25, 32, 42, and 45, Mad's statement hardly establishes that Villanueva was dishonest.  At the very least, a simple review of Villanueva's production logs should have led Minicola to further investigation.  Instead, Minicola jumped to the conclusion that Villanueva had lied.

   As another example, Minicola's conclusion that Villanueva lied about needing "disinfectant" to gain access to the housekeeping office is spurious.  The record makes clear that Villanueva consistently used the term "disinfectant" to refer to aerosol sprays.  Respondents nonetheless insist that Villanueva knew the difference between bug spray and disinfectant because he also used the term "disinfectant" to refer to deodorizers.  *See* Resp't Opp'n at 21.  But Villanueva's testimony establishes that he used this term indiscriminately to refer to aerosol sprays, which is not surprising given that English is his second language.  And a simple review (again, which Minicola did not do) confirms that Villanueva believed that the term "disinfectant" in fact included bug spray -- his July 3, 2010 production log (created prior to the time Villanueva would have any motive to lie) states "spray disinfectant (Roaches)."  Joint Ex. B, GC 42.  Thus, any argument

that Villanueva intentionally deceived Hangai is absurd.

As to Minicola's assertion that Villanueva violated House Rule #2 prohibiting theft when he failed to return the bug spray, Minicola had no evidence that Villanueva stole the spray can.  Given that Villanueva felt that Hotel management was watching him, Joint Ex. A at 409-10, Villanueva was especially careful in placing the spray can in his housekeeping bag at the end of the night and it would make no sense that Villanueva would steal a spray can that Hangai specifically watched him take for use in the Hotel.  Thus, Minicola's speculative conclusion that Villanueva stole the bug spray provides further support that Respondents were motivated by Union animus and would not otherwise have taken the same disciplinary actions.[10]

As to Minicola's finding that Villanueva violated House Rule #12 prohibiting entry into non-designated areas when he accessed the housekeeping office after hours, even Minicola admitted that he was not aware of any specific rules regarding entry into the housekeeping office.  Given the particular

---

[10]  Indeed, Respondents took lesser disciplinary actions against other employees that misplaced items.  For example, Housekeeper J.B. "lost" the master key card and failed to report it missing, which led to the Hotel having to re-key the master key card and re-program all guest rooms in the Beach Tower.  Joint Ex. B at GC24(D), pp. 1-11.  J.B. also lied to housekeeping supervisor Hind about whether he had gone to an unassigned floor, but was not cited for "dishonesty."  *Id.* at p. 1.  Compared to Villanueva's suspension and termination, the Hotel gave J.B. a verbal warning and a five-day suspension.  *Id.* at pp. 1, 6.

circumstances -- that Hangai escorted Villanueva to the housekeeping office and allowed Villanueva to enter, and Villanueva was new to working the evening shift -- this "violation" lacks support and reflects not a neutral application of the House Rules, but a specific animus towards Villanueva because of his Union support.[11]

As to Minicola's claim that Villanueva violated House Rule #30 by being dishonest at the July 20, 2010 meeting, the minutes of the July 20, 2010 meeting reveal that Minicola asked Villanueva a series of vague questions that Villanueva did not fully understand, *see* Joint Ex. B at GC20, and Omonaka described Minicola's questioning as confusing.  Joint Ex. A at 780.  This single interview with Villanueva hardly supports a finding that Villanueva tried to impede Minicola's investigation and/or otherwise was dishonest given that Minicola refused to tell Villanueva and the Union officials up front the precise subject matter of the meeting, English is not Villanueva's first language, and Minicola did not make much effort at all to clarify his questions.  Further, although Minicola did receive some evidence suggesting that Villanueva may have violated some rules on use of the bug spray, there is no dispute that Villanueva had sprayed for insects on

---

[11] Respondents assert "[t]he fact that the door to the Housekeeping Office is locked, and housekeeping employees are not given a key to the office, clearly means that housekeeping employees do not have permission to enter the office at night."  Resp't Opp'n at 71.  Again, Respondents overreach.  Indeed, the evidence presented establishes that regardless of any purported "policy" against access, the security guards provided access when asked.

multiple occasions and did not know of these rules such that his actions did not

warrant the harsh discipline of termination meted out by the Hotel.

Finally, as to Minicola's assertion that Villanueva violated House

Rule #42 requiring employees to follow Hotel rules when he failed to get proper

authorization to access the housekeeping office, removed the bug spray from the

office without logging it, and sprayed an occupied guest room, as explained above,

there were no established Hotel rules on these issues.  Indeed, even Minicola

admitted that he was unaware of any written policies or procedures regarding

access to the locked housekeeping office.

In opposition, Respondents argue that there were multiple instances in

which Villanuava was dishonest, supporting his termination.  For example,

Respondents assert that Villanueva (1) lied to Hangai when he sought the

"disinfectant" from the housekeeping office; (2) could not identify who had given

him the work order to spray the cockroach; and (3) lied about spraying because no

guests were moved from their rooms and Villanueva's description of the guests did

not match the guests that stayed in the room he allegedly sprayed.  As explained

above, the court rejects that the record suggests that Villanueva was dishonest and

Respondents' assertions to the contrary are offensive in light of the record.

Throughout his logs and testimony, Villanueva has consistently used the term

"disinfectant" to refer to aerosol sprays (whether bug or deodorizer) such that his use of this word with Hangai does not support any inference of deceit. Most importantly, prior to July 5, he referred to spraying "disinfectant" to kill roaches. *See* Joint Ex. B, GC 14 at 42. Further, that Villanueva could not identify who gave him the work order and/or possibly described the room's occupants incorrectly should come as no surprise[12] -- Villanueva had used bug spray on several other occasions, and he was questioned about the July 5, 2010 event over two weeks after it occurred. Finally, there is no evidence that Villanueva actually lied about spraying for a cockroach -- he obtained the bug spray and wrote on his log "spray dis/bugs."[13]

Respondents further argue that Villanueva was treated the same as other employees, and that some employees were terminated for infractions that were even less severe than those committed by Villanueva. Resp't Opp'n at 69.

---

[12] These alleged acts of "dishonesty" were not a basis of Minicola's stated reasons for terminating Villanueva, and the court discusses them here only to rebut Respondents' assertions that Villanueva was deceitful and/or dishonest, whether during Minicola's investigation or before ALJ McCarrick.

[13] The court recognizes that in its November 21, 2011 Order in *Frankl v. HTH Corp.*, Civ. No. 11-00451 JMS/RLP, the court also found relevant ALJ McCarrick's credibility determinations in finding that Petitioner had established a likelihood of success in establishing that Respondents terminated Villanueva in violation of the Act. ALJ McCarrick's credibility determinations, however, are not relevant in determining whether Petitioner has established by clear and convincing evidence that Respondents violated the March 29, 2010 Injunction. The court therefore does not consider ALJ McCarrick's credibility determinations in ruling on the Contempt Motion.

Again, the court disagrees.  As explained above, Villanueva was ultimately terminated for violating a handful of unwritten rules of which he was not aware and where not otherwise intuitive.  Under these circumstances, Villanueva's termination does not appear similar in kind to terminations of other employees. Further, Respondents terminated Hotel employees for violations that were far more serious than Villanueva's alleged violations, including, among others, the termination of (1) B.F.[14] for failing to report to work for three days; (2) S.J. for failing to report for work for six days; (3) B.T. for sleeping during his shift; (4) K.C. for completing his time card for a day he did not work; and (5) J.B. for a repeated refusal to follow directions of his supervisor and failure to perform his job duties.  Joint Ex. B at GC25(G), p. G8; Joint Ex. C at Resp't 12, pp. 3, 12, 27, and 71.

In sum, there is no evidence of any established rules that Villanueva violated, no evidence that Villanueva was aware of the rules he allegedly violated, and scant evidence supporting Minicola's conclusion for termination.  Rather, the evidence strongly supports the singular conclusion that Respondents disciplined and terminated Villanueva to discourage Union participation.  It is inexplicable

---

[14]  Out of privacy concerns for disciplined employees, the court refers to them by their initials.

how, especially after Respondents had terminated Villanueva once out of Union animus, Respondents could possibly believe that these trumped up Rules violations would support Villanueva's termination.  The court therefore concludes that Respondents did not act in good faith in disciplining and terminating Villanueva, and certainly did not take reasonable steps to comply with March 29, 2010 Injunction.  Petitioner has established by clear and convincing evidence that Respondents disciplined and terminated Villanueva in violation of §§ 1(c) and 1(e) of the March 29, 2010 Injunction.

### 2.   *Change in housekeeper room cleaning requirements*

Petitioner argues that Respondents violated the March 29, 2010 Injunction when they unilaterally changed the number of rooms that housekeepers must clean without bargaining.

### a.   *Facts*

In December 2007, Respondents unilaterally changed the number of rooms that housekeepers must clean from 15 to 17 rooms per day in the Beach Tower and 16 to 18 rooms per day in the Ocean Tower.  *See HTH Corp.*, 2011 WL 2414720, at *2, 6.  The March 29, 2010 Injunction required Respondents to rescind this (and multiple other) unilateral changes upon the Union's request.  Appendix (at § 2(e) of injunctive relief).  Accordingly, upon the Union's request, on April 18,

39

2010, Respondents restored the original room cleaning assignments.  Joint Ex. A at 1509; Joint Ex. B at GC36.

At a June 24, 2010 meeting between Minicola and Union representatives, Minicola gave notice that effective July 1, 2010, Respondents were again increasing the room cleaning requirements from 15 to 17 rooms per day in the Beach Tower and from 16 to 18 rooms per day in the Ocean Tower.[15]  Joint Ex. A at 1501, 1503; Joint Ex. B at GC54.  Minicola explained that the increase was due to, among other things, economic hardship and the changing nature of the hotel occupancy.  Joint Ex. A at 1501, 2658-59, 2660-61.  In a June 25, 2010 letter confirming this meeting, Minicola told Union representative, Dave Mori ("Mori"), that the Hotel would be increasing the room assignment requirements as discussed, and that the Hotel is willing "to bargain over the effects of the changes."  Joint Ex. B at GC54.  Also in a June 25, 2010 letter, Mori demanded that Minicola not implement any unilateral changes until, among other things, the Hotel bargains with the Union.  Joint Ex. B at GC55.  As promised by Minicola, the increase to the room cleaning requirements went into effect on July 1, 2010.  Joint Ex. A at 2664.

---

[15]  Prior to this June 24, 2010 meeting, Minicola and Union representatives had met on a few occasions to discuss implementation of the March 29, 2010 Injunction.  According to Minicola, during these meetings he raised the Hotel's need to increase the room assignments due to financial reasons.  Joint Ex. A at 2651-57.

In a September 13, 2010 letter, Minicola stated that Respondents were implementing the original 15 room requirement for the Beach Tower and the 16 room requirement for the Ocean Tower. Joint Ex. B at GC76. Minicola explained that the increase did not work -- "[w]hile the housekeepers were scheduled with the 17-18 rooms in mind, the Hotel found it unworkable and the so-called quota 15-16 rooms never really changed despite that notice and the attempts to schedule with 17-18 rooms." *Id.* Minicola therefore reasoned that "the 15-16 rooms quota is back in place and in fact has never changed." *Id.*

Despite Minicola's September 13, 2010 letter asserting that the room assignment requirements were restored, the housekeeping logs reflect that Respondents did not restore the room requirements as promised in Minicola's September 13, 2010 letter. Specifically, housekeeper Virginia Recaido's ("Recaido") logs reveal that since September 13, 2010, she had cleaned rooms according to the higher requirements. Joint Ex. A 2180-2209, 2235-46, 2247-54, 2251-61, 2262-76, 2282-86; Joint Ex. B at GC93; Joint Ex. C at Resp't Exs. 29-32. Further, even Minicola now asserts that "[f]or a few months during the end of 2010 and beginning of 2011, the number of rooms assigned to housekeepers to clean fluctuated due to economic demands of the Hotel's operations," resulting in times where housekeepers were assigned either more or less than the agreed-to number

depending on the Hotel's needs.  *See* Doc. No. 37-1, Minicola Decl. ¶ 3.  Minicola further asserts that "[a]s of April 2011, the housekeeping room assignments remained at 15 per day for the Beach Tower and 16 per day for the Ocean Tower." *Id.* ¶ 4.

        *b.*    *Application*

        Petitioner argues that Respondents' unilateral increase of the Hotel room cleaning assignments violated several provisions of the March 29, 2010 Injunction, including: § 1(b) requiring Respondents to cease and desist from refusing to recognize or bargain in good faith with the Union with respect to the terms and conditions of employment for its bargaining unit employees; § 1(d) requiring Respondents to cease and desist from unilaterally changing the terms and conditions of employment of bargaining unit employees; § 1(e) requiring Respondents to cease and desist from interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by the Act; § 2(a) requiring Respondents to recognize and bargain in good faith with the Union; § 2(b) requiring Respondents to honor all tentative agreements entered into as of November 30, 2007; and § 2(d) requiring Defendants to immediately rescind, at the Union's request, any or all of the unilateral changes to bargaining unit employees' terms and conditions of employment as they existed prior to December 1, 2007.

These provisions in the March 29, 2010 Injunction are co-extensive with §§ 8(a)(1) and 8(a)(5) of the Act, which prevents and employer from making "a unilateral change in a term or condition of employment -- so-called 'mandatory subjects' of bargaining -- without first bargaining to impasse over the relevant term." *Local Joint Exec. Bd. of Las Vegas v. NLRB*, 540 F.3d 1072, 1075 (9th Cir. 2008) (discussing *NLRB v. Katz*, 369 U.S. 736 (1962)); *Richmond Elec. Servs.*, 348 NLRB 1001, 1002 (2006). "A bargaining impasse occurs at the point in time when the parties would be warranted in believing that continued bargaining would be futile." *Richmond Elec. Servs.*, 348 NLRB at 1002. And where the parties are negotiating a collective bargaining agreement, "an employer's obligation to refrain from unilateral changes extends beyond the mere duty to give notice and an opportunity to bargain; it encompasses a duty to refrain from implementation at all, unless and until an overall impasse has been reached on bargaining for the agreement as a whole." *Bottom Line Enters.*, 302 NLRB 373, 374 (1991). The Board recognizes two limited exceptions to requiring an employer to bargain to impasse: "[w]hen a union, in response to an employer's diligent and earnest efforts to engage in bargaining, insists on continually avoiding or delaying bargaining, and when economic exigencies compel prompt action." *Id.*

The mandatory subjects of bargaining include "wages, hours, and

other terms and conditions of employment."  29 U.S.C. § 158(d).  Employees'

workloads, such as the number of rooms a housekeeper must clean at issue here, is

a mandatory subject of bargaining.  *See HTH*, 2011 WL 2414720, at *6 (holding

that Respondents violated §§ 8(a)(1) and (5) of the Act unilaterally changing the

housekeepers' workloads by adding two additional rooms to clean per day); *see*

*also Beacon Piece Dyeing & Finishing Co.*, 121 NLRB 953 (1958) (explaining that

workloads such as the number of machines assigned to an employee are mandatory

subjects of bargaining).

        The evidence clearly establishes that Respondents unilaterally

changed the number of rooms that housekeepers were assigned to clean without

bargaining to impasse on a collective bargaining agreement.  Thus, unless

Respondents' conduct falls within a recognized exception, Respondents had no

excuse for making this unilateral change in violation of the Act and the March 29,

2010 Injunction.

        None of Respondents' justifications for making this unilateral change

withstands scrutiny -- they neither establish that their actions fell within a

recognized exception nor suggest that Respondents took every reasonable step to

comply with the March 29, 2010 Injunction.  For example, Respondents argue that

the change was de minimis -- and therefore not subject to mandatory bargaining --

because the changes lasted for only several months and the actual number of rooms

housekeepers cleaned fluctuated such that the change did not affect the

housekeeper's overall workload.  Resp't Opp'n at 73-74.  As an initial matter,

Respondents' assertion that the increase in rooms did not affect housekeeper

workloads is not supported by the evidence -- although Minicola generally asserts

that the number of rooms housekeepers were required to clean fluctuated, the more

specific and objective evidence (*i.e.*, Reciado's testimony and logs), establishes

that she was consistently assigned to clean rooms based on the higher room

requirement.

   Further, the room assignment requirement was not de minimis -- it

materially and significantly affected the terms and conditions of employment of the

housekeepers by increasing the number of rooms they may need to clean on a

given day.  *See HTH*, 2011 WL 2414720, at *6 (holding that the number of rooms

that housekeepers must clean is a mandatory subject of bargaining); *see also EAD

Motors E. Air Devices, Inc.*, 346 NLRB 1060, 1065 (2006) ("[T]he Board has

made clear that in order to constitute a unilateral change that violates the Act, an

employer's action must effect a material, substantial, and significant change in

terms or conditions of employment."); *Seattle First Nat'l Bank v. NLRB*, 444 F.2d

30, 33 (9th Cir. 1971) ("A mere remote, indirect or incidental impact is not

sufficient."). That the increase was not de minimis is confirmed by the fact that Respondents disciplined housekeepers who failed to clean their assigned number of rooms. *See* Joint Ex. C at Resp't Ex. 14, p. 53 (disciplining housekeeper Marissa Julian on July 26, 2010 for failure to complete cleaning 17 rooms in the Beach Tower); *see also* Joint Ex. B at GC24(A), pp. 10, 14, 21, 28; GC24(I), pp. 15, 31, 52 (disciplining housekeepers for failure to meet quotas between 2007 and 2009).

Respondents also argue that this unilateral change is justified because the Union engaged in delay tactics by refusing to bargain over this issue and instead insisted upon reaching a collective bargaining agreement. Respondents even go so far as to suggest that Minicola and the Union had bargained over this change during their preliminary meetings regarding implementation of the March 29, 2010 Injunction and the Union simply refused to discuss the matter. *See* Resp't Opp'n at 75; *see also* Joint Ex. A at 1731. Contrary to Respondents' attempt to cast these preliminary meetings, they were not formal negotiations -- Respondents did not engage in *any* formal negotiations with the Union until August 30, 2010 (after they had already implemented the change in room requirements). *See* Joint Ex. A at 1758; *see also* Joint Ex. B, GC Exs. 54-57, 60-61 (letters between Mori and Minicola describing meetings prior to August 30, 2010). Indeed, there is no evidence that Respondents ever sought to engage in formal negotiations over the

46

room assignment requirements before implementing this unilateral change.  *See Joint Ex. B at GC96* (Negotiations Ground Rules Agreement, signed by Minicola and Mori, outlining that formal negotiation sessions be set by mutual agreement of the parties, rotate locations between the Union's and the Hotel's choice, and that the parties must communicate at the negotiation table through their spokespeople, Mori and Minicola); *see also* Joint Ex. A, at 2684-85.  Thus, without any attempt on Respondents' part to formally bargain over this change, the Union (who took a perfectly valid position of seeking an agreement instead of a piecemeal approach) could not have engaged in any delay tactics.[16]

Respondents further argue that the change in the housekeeping room assignment requirements was due to economic exigencies.  Again, this argument lacks evidentiary support.  The exception to bargaining to impasse due to economic exigencies is limited to "extraordinary events which are an unforeseen occurrence, having a major economic effect [requiring] the company to take immediate action."

---

[16]  The court also finds relevant the timing of this unilateral change as supporting a lack of delay by the Union.  The March 29, 2010 Injunction required the parties to begin negotiations from the point that negotiations stopped between the Union and PBH Management, LLC ("PBHM"), an entity that managed the Hotel from January 2007 until November 30, 2007.  On June 14, 2010, the Union provided Respondents a list of all tentative agreements the Union believed it had entered into with PBHM, and Respondents were still reviewing the list as of the first negotiation session on August 30, 2010.  Joint Ex. B at GC52; Joint Ex. A at 1734-35.  Given that one of the tentative agreements was the room assignment requirements and Minicola implemented this change before even reviewing all of the tentative agreements, there is simply no evidence that the Union delayed in negotiations.

*RBE Elec. of S.D., Inc.*, 320 NLRB 80, 81 (1995) (quoting *Hankins Lumber Co.*, 316 NLRB 837, 838 (1995)).  For example, "the Board has held that economic events such as loss of significant accounts or contracts, operation at a competitive disadvantage, or supply shortages do not justify unilateral action." *Id.* (footnotes omitted).  Respondents fail to identify, much less establish through evidence, any extraordinary event that has had a major economic effect requiring the Hotel to change the housekeeping room assignment requirements.[17]

Finally, Respondents assert that the room assignment numbers have been restored since April 2011.  Assuming that the court takes Minicola on his word (despite his previous untruthful statements regarding the room assignment requirements), whether the room assignment numbers have been restored does not change that Respondents violated the March 29, 2010 Injunction and the Act in the first instance.  Respondents' last minute attempt to comply with their obligations does not change that they flouted their obligations for several months (despite being told by Mori that this unilateral change violated the terms of the March 29, 2010 Injunction),[18] and certainly does not suggest that they took every reasonable

---

[17]  As explained below, Respondents provided only the most basic financial information which is insufficient for the Union, the Union's accountant, and even this court to determine whether Respondents' assertions of poverty have any merit whatsoever.

[18]  Although Minicola testified that he does not recall making such statement, *see* Joint

(continued...)

48

step to comply with the March 29, 2010 Injunction.  The court therefore finds that Petitioner has established by clear and convincing evidence that Respondents violated §§ 1(b), 1(d), 1(e), 2(a), and 2(b) of the March 29, 2010 Injunction.

### 3.   *Access to the Hotel*

Petitioner argues that Respondents violated the March 29, 2010 Injunction by banning two Union representatives from the Hotel.

### a.   *Facts*

Since approximately 2006, the Hotel and the Union had an oral understanding regarding the procedure for Union representatives to gain access to the Hotel.  Joint Ex. A at 1418-19.  Minicola testified that under the terms of the oral understanding, the Union representative would request access and inform the Hotel of who would be coming, the date and time of access, and the reason for access.  *Id.* at 1419.  Minicola granted requests on the condition that the Union representatives would not enter unauthorized areas or disrupt Hotel operations.  *Id.*

On April 28, 2010, Mori requested permission to enter Hotel property to have lunch at Respondent's Oceanarium Restaurant (the "Oceanarium") with

---

[18](...continued)
Ex. A at 2662-63, Mori testified that when he told Minicola that increasing the room requirements would be a violation of the March 29, 2010 Injunction, Minicola allegedly responded with something along the lines of "fuck the judge, he's wrong," *id.* at 1729, and that his actions were not illegal unless he went to jail.  *Id.* at 1737.

Union organizer Carmelita Labtingao ("Labtingao"), and Minicola granted Mori's request. *Id.* at 1421-23, 1676.

Upon Mori and Labtingao's arrival at the Oceanarium, bus help Midori Fukushima ("Fukushima") greeted Labtingao, whom Fukushima recognized as having worked at the Hotel and with the Union. *Id.* at 1552-53, 1555-56. Labtingao asked Fukushima if she remembered her, and Fukushima answered, "Yes, you're from the Union." *Id.* at 1820. Labtingao testified that Fukushima mentioned that times were hard because Fukushima had less hours. *Id.* at 1820-21. Labtingao told Fukushima that the Hotel is recognizing the Union, and Fukushima then left the table. *Id.* at 1558, 1821-22.

Oceanarium Assistant Manager Charles Sayles ("Sayles") testified that soon after Mori and Labtingao arrived, Fukushima came back to his office behind the bus station looking "kind of upset" and shaking her head. *Id.* at 2504. When Sayles asked Fukushima if she was okay, Fukushima said, "Oh, the lady outside asked me if . . . you're part of the Union" and that when Fukushima told Labtingao that she did not know, Labtingao said, "Yeah, you are part of the Union." *Id.* at 2505; Joint Ex. B at GC 80, p. 3. Sayles testified that Fukushima refused to go back onto the restaurant floor. *Id.* at 2506.

In contrast, Fukushima testified that she was not upset by what

Labtingao said to her, nor did she tell anyone in the Oceanarium that she was upset or that she refused to go back onto the restaurant floor. *Id.* at 1559, 1567. According to Fukushima, when she saw that Sayles was waiting to talk to her by the entrance to his office, she asked him if the Hotel joined the Union, and Sayles wanted to know what Mori and Labtingao said to Fukushima. *Id.* at 1559-60. Sayles then told Fukushima not to return to the restaurant floor, and Fukushima testified that she did not understand why the restaurant management was "making such a big deal out of this." *Id.* at 1561, 1598. Fukushima further testified that neither Labtingao nor Mori were loud in any way nor were they causing any commotion at the Oceanarium. *Id.* at 1567; *see also id.* at 1687 (Mori testifying that Fukushima did not look upset or give any indication that she was upset).

Beyond speaking with Fukushima, Labtingao testified that she also said hello in passing to wait help Joyce Kekona ("Kekona"), but nothing else.[19] *Id.* at 1824. Fukushima, however, met with Kekona in the back of the Oceanarium, and Kekona said Labtingao told her that the Hotel had joined the Union. *Id.* at 1611. Fukushima testified that Kekona seemed upset because she was speaking loudly, but that Kekona is generally a loud person who makes big gestures. *Id.* at 1603. Banquet porter Alexander Adams ("Adams") testified that Kekona appeared

---

[19]  Kekona did not testify in the administrative hearing.

51

irritated that Mori and Labtingao spoke to her about the Union. *Id.* at 2378.

According to Sayles, because Fukushima was upset, he told Mori and Labtingao that they cannot talk to employees about the Union while on shift and that Fukushima had complained; Mori agreed to the request. *Id.* at 1464, 2510-11, *see also* Joint Ex. B at GC88, p. 4. Because Fukushima was still upset, Sayles called Safety and Security Manager Hangai to report that Fukushima felt harassed. *Id.* at 1470-71, 2511. Hangai, accompanied by two security officers in case he needed backup, went to the Oceanarium and interviewed Fukushima. *Id.* at 2400. Hangai testified that during his interview with Fukushima, she looked visibly upset and told him that "they had said things to her" and that she did not want to return to the floor. *Id.* at 1623-24. Hangai also spoke to Kekona, who told him that Mori and Labtingao told her "you're in the Union," and that Kekona responded "yeah, yeah, yeah, I didn't want to be involved" and walked away. *Id.* at 1626.

After speaking with Fukushima, Hangai told Mori that they had received a complaint that he and Labtingao were being disruptive and that both of them would have to leave the area. *Id.* at 1621-22, 1685. Mori refused to leave, saying he had done nothing wrong, and Hangai told Mori that he would call the police. *Id.* at 1622, 1685. After Mori's conversation with Hangai, Mori and Labtingao paid for their meal and left the Oceanarium. *Id.* at 1686.

On May 6, 2010, Minicola issued a letter to Mori, permanently banning him and Labtingao from Hotel premises.  *Id.* at 1437-38, Joint Ex. B at GC42, p. 2.  Minicola testified that he made his decision based on Hangai's written security report and conversations with Sayles, Hangai and Mori.  *Id.* at 1436. Mori, however, denies speaking with Minicola about the Oceanarium incident prior to May 6, 2010 and spoke with Minicola only after receiving the May 6, 2010 letter to explain that he had not spoken with any employees during lunch and that he objected to Hangai's asking him to leave.  *Id.* at 1689, 1692, 2619-20.

Minicola subsequently posted a May 14, 2010 memorandum to Hotel employees, which in part stated that Mori and Labtingao were asked to leave Hotel property and not return because they disrupted Hotel operations and that the incident had been filed with the police department.  Joint Ex. B at GC45.[20] Although Minicola has allowed other Union representatives access to the Hotel, Mori and Labtingao have not returned to the Hotel since April 28, 2010.  Joint Ex. A at 1703, 2628-29.  Minicola stated that he would allow Mori access to Hotel property if he apologized to the employees, and Mori refused.  *Id.* at 2624.

---

[20] On May 14, 2010, Hangai filed a police report regarding the incident, but there was no further police involvement.  Joint Ex. A at 1633; Joint Ex. B at GC81.

53

### b.   Application

Petitioner argues that Respondents' banning of Mori and Labtingao from Hotel premises without justified reason and/or without bargaining violated §§ 1(b), 1(d), 1(e), 2(a), 2(b), and 2(d) of the March 29, 2010 Injunction, which, as explained above, is co-extensive with Respondents' obligations pursuant to §§ 8(a)(1) and 8(a)(5) of the Act.

As to these provisions of the Act, "[a]n employer's regular and longstanding practices that are neither random nor intermittent become terms and conditions of employment even if these practices are not required by a collective-bargaining agreement." *Prime Healthcare Servs.-Garden Grove LLC*, 357 NLRB No. 63, 2011 WL 3804018, at *8 (Aug. 26, 2011) (citing *Sunoco, Inc.*, 349 NLRB 240, 244 (2007)).  As a result, "these past practices cannot be changed without offering the unit employees' collective-bargaining representative notice and an opportunity to bargain." *Id.* (citing *Sunoco, Inc.*, 349 NLRB at 244).  An employer's regular practice of allowing union officials access to facilities may become a term and condition of employment requiring notice and bargaining before a change.  *See Ernst Home Ctrs., Inc.*, 308 NLRB No. 116, 1992 WL 238855, at *2-3 (NLRB Sept. 17, 1992); *Granite City Steel Co.*, 167 NLRB 310, 315 (1967).

54

The parties do not dispute that Respondents had a practice of allowing Union representatives access to Hotel facilities on the condition that Union representatives would not enter unauthorized areas or disrupt Hotel operations, and that any change in this policy would require mandatory bargaining. Thus, the relevant question presented is whether Respondents' ban of Mori and Labtingao was a change in that policy requiring bargaining, or simply an implementation of that policy based on a disruption of Hotel operations.

The evidence presented tells two different stories. According to Sayles and Hangai, Labtingao upset Fukushima to the point where Fukushima refused to return to her duties bussing tables. If this testimony is credited, Mori and Labtingao arguably caused a disruption at the Oceanarium, which would potentially allow Minicola to ban them from the premises. In comparison, according to Fukushima, Labtingao, and Mori, Fukushima was not upset and failed to return to the floor only upon Sayles' instructions. If this testimony is credited, then Mori and Labtingao did not cause any disruption and Minicola's decision to ban them was a unilateral change of the policy of allowing Union representatives access to the Hotel.

Viewing all of the evidence, and in light of these two different stories, the court finds that Petitioner has not carried his burden of establishing by clear

55

and convincing evidence that the version told by Fukushima and Mori happened. Although evidence suggests that this version more than likely occurred,[21] Petitioner's burden is by clear and convincing evidence.  The court therefore finds that Petitioner has not established by clear and convincing evidence that Respondents violated the March 29, 2010 Injunction by banning Mori and Labtinago from the Hotel premises.

### 4.    *Failure to Produce Requested Information*

Petitioner argues that Respondents' failure to provide certain categories of information requested by the Union violated §§ 1(b), 1(d), 1(e), 2(a), 2(b), and 2(d) of the March 29, 2010 Injunction, which, as explained above, is co-extensive with Respondents' obligations pursuant to §§ 8(a)(1) and 8(a)(5) of the Act.

"It is long-established law that the duty to bargain in good faith embodied in Section 8(a)(5) of the Act includes the obligation of employers to provide their employees' collective-bargaining representatives with requested information which is relevant and necessary to the representative's duty to bargain

---

[21]  In the November 21, 2011 Injunction, the court found that Petitioner had shown a likelihood of success on the merits in establishing that Mori and Labtingao were improperly banned from the Hotel, based in part on ALJ McCarrick's crediting Fukushima's testimony.  As described above, the court does not consider ALJ McCarrick's credibility determinations for purposes of this Motion, and Petitioner has a higher burden.

on behalf of employees." *H&R Indus. Servs.*, 351 NLRB 1222, 1223 (2007) (citing *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 435-36 (1967)); *Doubarn Sheet Metal*, 243 NLRB 821, 823 (1979). An employer fails to bargain in good faith in violation of § 8(a)(5) of the Act when it delays and/or fails to produce relevant information. *Acme Indus. Co.*, 385 U.S. at 437; *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149 (1956). "[T]he Board uses a broad, discovery-type of standard in determining relevance in information requests." *Caldwell Mfg. Co.*, 346 NLRB 1159, 1160 (2006) (citations omitted).

But there are situations where an employer is justified in limiting or conditioning disclosure of otherwise relevant information where there are overriding interests. *See Detroit Edison Co. v. NLRB*, 440 U.S. 301, 319-20 (1979). Specifically, "[w]here the relevance of requested information has been established, an employer can meet its burden of showing an adequate reason for refusing to supply the information by demonstrating a 'legitimate and substantial' concern for employee confidentiality interests which might be compromised by disclosure." *Ormet Aluminum Mill Prods.*, 335 NLRB 788, 801 (2001) (quoting *Detroit Edison Co.*, 440 U.S. at 318-320).

The court addresses each of the categories of information requested by the Union and withheld by Respondents.

*a.*     *Failure to produce information related to collective bargaining*

i.     Facts

After the March 29, 2010 Injunction, the Union requested various

information regarding Hotel employees' concerns about scheduling and benefits.

Specifically, in a June 8, 2010 letter, Mori requested (1) a seniority list with

departmental work schedules from December 1, 2007 to the present; (2) daily room

assignments for housekeeping employees from April 19, 2010 to the present; (3)

disciplinary actions issued to housekeeping employees from December 1, 2007 to

the present; and (4) a list of employees who earned Perfect Attendance Awards

from 2007-2009 and the number of days off each employee received per year.

Joint Ex. A at 1704-09; Joint Ex. B at GC49.  Minicola denied Mori's request,

stating that: (1) Minicola did not have access to anything beyond current

departmental work schedules; (2) the daily room assignments were irrelevant

because the room requirements had been restored to 15 and 16 rooms per day;

(3) it was against Hotel policy to release disciplinary records; and (4) the Hotel did

not have access to the 2007 Perfect Attendance Award and would not provide 2008

and 2009 information unless Mori could identify a specific employee about whom

he was concerned.  Joint Ex. A at 2630-40.

On December 7, 2010, Respondents provided the Union with all

58

departmental work schedules from August 29, 2010 to December 4, 2010, but did not provide work schedules from the other requested time periods. *Id.* at 1705-06; Joint Ex. B at GC77. Minicola asserts that he also recently provided additional information to the Union, including (1) six months of work schedules for the Stewards Department on June 28, 2011; (2) six months of work schedules for the Housekeeping Department on September 15, 2011; and (3) documents contained in an employees' file that the Hotel relied upon in terminating two employees on September 15, 2011. Doc. No. 37-1, Minicola Decl. ¶¶ 7, 9.

ii.    Application

There is no dispute between the parties that Respondents must furnish to the Union, upon request, information that is relevant and necessary for the Union to carry out collective bargaining. *See Acme Indus. Co.*, 385 U.S. at 435-36. There is also no dispute between the parties that the information requested by the Union generally falls within the categories of information that must be provided. *See, e.g.*, *Superior Prot., Inc.*, 341 NLRB 267, 269 (2004) ("[I]t is well established that information concerning unit employees' names, addresses, phone numbers, work assignments, and hours is presumptively relevant for purposes of collective bargaining and must be furnished on request."); *Grand Rapids Press*, 331 NLRB 296, 299 (2000) ("[T]he Board has repeatedly held that requested bargaining unit

employee disciplinary records are presumptively relevant and must be furnished on request, unless (the) relevance it rebutted." (citations omitted)); *Leland Stanford Junior Univ.*, 307 NLRB 75, 80 (1992) ("The Board has long held that Section 8(a)(5) of the Act obligates an employer to furnish requested information which is potentially relevant to the processing of grievances. An actual grievance need not be pending nor must the requested information clearly dispose of the grievance.").

It is therefore inexplicable how Respondents could possibly contend that Minicola's explanations were somehow sufficient to excuse Respondents' failure to promptly produce the requested information. For example, as to the daily room assignments and perfect attendance awards, Minicola cannot seriously contend that he need not produce them -- the assignments and awards affect the terms and conditions of employment and Minicola's simple refusal to produce them has no basis in law or fact. And in any event, Minicola's excuse did not hold true -- although Minicola asserted that the daily room assignments were irrelevant because he had restored the requirements to 15 and 16 rooms per day, Minicola unilaterally increased the room assignment assignments on July 1, 2010, less than a month after Mori requested this information.[22] Thus, Minicola's assertion that this

---

[22] Further, even if Minicola had restored the room assignments and never made the unilateral increase, the information is still relevant. Again, Respondents have confused the analysis at hand -- the question is not whether the parties are negotiating a particular term and/or

(continued...)

information was irrelevant is nothing more than an excuse, and a poor one at that.

Nor do any of Minicola's other excuses hold water.  As to department
work schedules, even if Minicola could not find schedules for prior years, Minicola
had a duty to promptly produce work schedules that were available; his production
of only some work schedules months after the Union's request without any good
reason does not meet Respondents' obligations under the Act.  *See West Penn
Power Co.*, 339 NLRB 585, 587 (2003) (providing that in determining whether the
requested information has been furnished in a timely manner, the Board considers
the totality of the circumstances and requires that an employer make a reasonable
"good faith effort to respond to the request as promptly as circumstances allow").
As to the disciplinary records, Minicola's generalized and conclusory assertion that
their production is against Hotel policy does not carry Respondents' burden of
establishing a sufficient reason that rebuts that the Union should be provided this
information.  *See Grand Rapids Press*, 331 NLRB at 299.

In finding that Minicola had no real excuse for his failure to provide
the requested information, the court recognizes that he eventually produced *some*
of the requested information.  But this delayed partial production hardly suggests

---

[22](...continued)
the issue is in dispute; the question is whether the information requested is relevant to the terms
and conditions of the employment.

61

that Respondents substantially complied with their obligations under the March 29, 2010 Injunction or the Act; rather, it appears that Respondents simply stalled as long as long as they could.  The court therefore finds that Petitioner has established through clear and convincing evidence that Respondents violated §§ 1(b), 1(d), 1(e), 2(a) and 2(b) of the March 29, 2010 Injunction by refusing to produce upon the Union's request information relevant to the Union's collective bargaining duties.

b.    *Failure to produce information related to grievance processing*

i.    Facts

The Union requested information from the Hotel as part of its investigation of grievances filed on behalf of Hotel employees George Ishikawa ("Ishikawa") and Villanueva, both of whom were terminated.  In both requests, the Union did not receive the majority of the requested information.

Specifically, as to Ishikawa's termination, Union business agent Karl Lindo ("Lindo") requested information relating to the grievance process via an April 21, 2010 letter, including (1) written or oral forewarning given to Ishikawa of the possible disciplinary consequences of his conduct; (2) investigative notes, reports, statements, and memos relating to Respondents' effort to discover whether Ishikawa violated the rule or policy; (3) names, addresses, and positions of all

62

witnesses to the relevant incident and of all management personnel who made

recommendations for or against the disciplinary action; and (4) all prior

disciplinary action against Ishikawa.  Joint Ex. B at GC37, pp. 3-4.

On April 26, 2010, Minicola responded by outlining the Hotel's two-

level appeals process of discipline decisions agreed to by Minicola and Mori,

which purportedly did not include furnishing information relating to the

employee's discipline decision.  Joint Ex. B at GC38.  Despite additional requests,

*see* Joint Exs. B at GC43, GC46, and GC50, Minicola provided only Ishikawa's

termination letter.  Joint Ex. A at 2641; Joint Ex. B at GC47.  Minicola asserted

that although the Hotel has a general process for disciplining employees,

Respondents and the Union had not agreed to a particular grievance procedure and

that it was not the Hotel's past practice or procedure to provide copies of

documents relating to disciplinary actions such that the Union was not entitled to

them.  *Id.* at GC47, p. 1.

On May 28, June 18, July 16, and July 26, 2010, Lindo made similar

requests for information relating to a grievance filed on behalf of Villanueva

regarding his "written verbal warning" and his subsequent suspension.  Joint Ex. B

at GC48, GC53, GC84, and GC85.  The Hotel informed the Union that it would

not be responding in writing to any of the submitted grievance forms because there

was no recognized grievance procedure.  Joint Ex. A at 2641-43.  Accordingly, the

Hotel did not provide any of the requested information in Villanueva's case.  *Id.*

When Respondents terminated Villanueva on July 28, 2010, the Union again

requested all documents related to Villanueva's suspension and termination.  Joint

Ex. B at GC86.  In an August 9, 2010 letter, the Hotel denied the Union's request

for information, but provided a copy of Villanueva's termination letter.  Joint Ex.

A at 1715-16; Joint Ex. B at GC87 p. 1.

ii.     Analysis

Even where the parties have not yet reached a collective bargaining

agreement, as is the case here, "the Union had a right to request information

relevant to its determination of whether Respondent breached existing practices

and policies in disciplining [employees], to advise the employees of their rights in

the event they were treated disparately, and to otherwise represent these members

in an appropriate fashion either through the internal grievance mechanism or

otherwise." *See Westside Comm. Mental Health Ctr.*, 327 NLRB 661, 667 (1999).

Thus, the Union had a clear right to receive documents regarding Ishikawa's and

Villanueva's discipline and termination so that it could determine whether

Respondents were following their discipline procedure, advise Ishikawa and

Villanueva of their rights, and represent them through the grievance procedure.

Respondents argue that they had no obligation to provide grievance information because there is no collective bargaining agreement in place and as a result, there is no grievance process that the Hotel must undergo with the Union.[23] Resp't Opp'n at 88-89.  Respondents ignore, however, that Minicola acknowledged that an in-house grievance procedure exists, explaining in an April 26, 2010 letter:

> We [Minicola and Mori] agreed that the Hotel would follow the employee handbook in effect at the time.  The procedure provided that the Union could appeal the decision first to the Hotel's Human Resource Manager.  If the Union was dissatisfied with the decision following the first level appeal, the Union had a final appeal to the Hotel's General Manager.

Joint Ex. B at GC38.  Even though the Hotel and Union have not bargained on and reached agreement as to a contractual grievance procedure, the Union still maintains a representational interest in this grievance process such that Respondents had an obligation to provide grievance information on bargaining unit employees.  *See Westside Comm. Mental Health Ctr.*, 327 NLRB at 667.

Respondents also argue that the Union is not entitled to witness

---

[23] Respondents did not timely assert a claim of confidentiality, which, if established, would balance against the relevance of the request for information.  *See River Oak Ctr. for Children, Inc.*, 345 NLRB 1335, 1336 (2005) ("[T]he Board balances the union's need for the information against any 'legitimate and substantial' confidentiality interests.  The party asserting privacy or confidentiality has the burden of proof, as well as a duty to seek an accommodation.").

statements or investigative reports in light of *Anheuser Busch, Inc.*, 237 NLRB 982 (1978). *Anheuser Busch, Inc.* held "that the 'general obligation' to honor requests for information, as set forth in *Acme* and related cases, does not encompass the duty to furnish witness statements themselves." 237 NLRB at 984-85. But *New Jersey Bell Telephone Co.*, 300 NLRB 42, 43 (1990), clarified that the duty not to produce statements depends on the context, including whether the witness received assurances of confidentiality, reviewed the statements, or otherwise adopted them, and whether the statement is a verbatim transcript as opposed to work product. In other words, there is no blanket prohibition to producing documents reflecting witness accounts and even if the circumstances of a witness statement suggested an overriding need for confidentiality (which Respondents did not assert), the Union would still be entitled to summaries. *See Penn. Power Co.*, 301 NLRB 1104, 1106 (1991).[24] Respondents did not provide any explanation of how the witness statement exception to production might apply

---

[24] Respondents further argue that in *U.S. Postal Service*, 305 NLRB 997 (1991), the Board held that an employer need not produce the opinions, comments, and recommendations of those who conducted the investigation. Given that it does not appear that the Union requested such information, the court need not address this argument. Further, even if the Union's requests could be read so broadly as to encompass these documents, the court is doubtful that *U.S. Postal Service* applies as broadly as Respondents argue. *U.S. Postal Service* affirmed the ALJ's specific finding that an investigation file created by the Inspection Service of the U.S. Postal Service, which functions solely to conduct audits and criminal and civil investigations, was highly confidential and need not be produced to the Union. 305 NLRB at 1006-07. No such similar facts exist here and Respondents never timely raised an assertion of confidentiality.

in this case.

The court therefore finds that Respondents have offered no substantiated reason why they had no duty to provide the requested information regarding grievances to the Union.  Although Respondents did provide the Union the termination letters, such production does not establish that they substantially complied with the March 29, 2010 Injunction -- Respondents knew and/or should have known that they were required produce the requested documents.  The court therefore finds that Petitioner has established by clear and convincing evidence that Respondents violated §§ 1(b), 1(e), and 2(a) of the March 29, 2010 Injunction by refusing to provide grievance-related information upon the Union's request.

> c.    *Failure to produce the Hotel's financial information*

> i.    Facts

The March 29, 2010 Injunction ordered Respondents to, among other things:

> resume contract negotiations and honor all tentative agreements entered into from the point Respondents and the Union, and PBHM and the Union, left off negotiations on November 30, 2007, and if an understanding is reached, embody such understanding in a signed agreement; provided, however, that the parties may in good faith reopen negotiations on any tentative agreement that has been validly affected by a change in economic or other circumstances[.]

*See* Appendix (at § 2(b)).

The Hotel subsequently made unilateral changes to the daily housekeeper room requirements, the 401(k) matching contribution arrangement, and the medical plan, which Minicola justified to Mori in a June 24, 2010 meeting by "pleading poverty."  Joint Ex. A at 1728-30, 2644-46; *see also* Joint Ex. B at GC31(q) ¶ 34.  Mori responded that the Union was not going to discuss any changes until the Hotel provided the Union with financial information.  Joint Ex. A at 2646.  Thus, in a June 25, 2010 letter, Mori requested that a CPA of the Union's choosing have an opportunity to review Respondent's financial records.  Joint Ex. B at GC55, p. 1.  Mori further requested that Respondent provide (1) an independent auditor's complete financial report covering the company's past two fiscal years, including balance sheets and statements of operations and cash flow; (2) corporate income tax returns for the past two fiscal years; (3) interim financial statements for the current year; and (4) a schedule showing breakdowns of executive compensation, wages paid to bargaining unit employees and all other employees in the past two calendar years.  *Id.* at pp. 1-2.

In a June 29, 2010 letter to Mori, Minicola stated that he would send the Union's CPA the same financial information Respondents sent to the NLRB in response to an unfair labor practice charge.  *Id.* at GC57.  Because the Union had

no knowledge of what financial information Respondents had sent to the NLRB, Mori asked that Respondents send the requested information outlined in his June 25, 2010 letter to Union's CPA, Lowell Nagaue ("Nagaue").  *Id.* at GC58.  On July 2, 2010, Minicola requested that Nagaue sign a confidentiality agreement before releasing any financial information, which Nagaue signed on July 28, 2010.  *Id.* at GC59 and GC68.

In an August 12, 2010 letter, Nagaue notified Minicola that the only documents he received were one-page uncertified Statements of Income and Loss for 2008 and 2009, which Nagaue asserted were insufficient to analyze the financial conditions of the Hotel.  Joint Ex. A at 2649-50; Joint Ex. B at GC72. Nagaue therefore asked Minicola to send the financial information previously requested by Mori.  Joint Ex. A at 2649-50.  After receiving no response from Respondents, Nagaue sent a follow-up letter to Minicola on August 23, 2010, requesting the financial information listed in his August 12, 2010 letter.  Joint Ex. B at GC74.

Minicola admits that he never provided the requested information, and even told Mori that Respondents would not give any further information.  *See* Joint Ex. A at 1530-31.  Minicola asserts that he did not respond to Nagaue's letters and did not send the additional financial information out of concern for

Nagaue keeping the information confidential.  *Id.* at 1529-30.

        ii.     Analysis

        "The Supreme Court has recognized that a company's refusal to substantiate a claim of inability to pay can lead to a finding of failure to bargain in good faith."  *NLRB v. Pac. Grinding Wheel Co.*, 572 F.2d 1343, 1348 (9th Cir. 1978) (citing *Truitt Mfg. Co.*, 351 U.S. at 153).  Whether an employer has failed to bargain in good faith by refusing to provide documents substantiating a plea of poverty "turn[s] upon its particular facts.  The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met."  *Truitt Mfg. Co.*, 351 U.S. at 153-54.

        Applying these principles, the particular facts of this case establish that Respondents plainly violated the court's March 29, 2010 Order by refusing to provide Nagaue necessary documents to substantiate their claim of poverty.  Specifically, Respondents were required to resume contract negotiations and honor all tentative agreements since leaving negotiations on November 30, 2007, and only reopen negotiations if a tentative agreement had been *validly* affected by a change in economic circumstances.  Respondents attempted to justify several unilateral changes on the basis of a change in economic circumstances, but refused to provide Nagaue anything beyond the most general uncertified Statements of

70

Income and Loss for 2008 and 2009.  As Nagaue testified, this information was

insufficient for him to render *any* opinion as to the financial condition of the Hotel

because, among other reasons, expenses were grouped in general categories

preventing Nagaue from determining whether there were any significant changes

over the two years, there was no balance sheet from which Nagaue could compare

assets and liabilities to determine ability to pay debts, and the statements were not

certified such that Nagaue had no confidence in the correctness of the Statements

and had no way to verify the numbers.  Joint Ex. A, at 1939-43.  And the Board has

rejected that uncertified financial statements are sufficient to meet an employer's

burden to produce financial information.  *See, e.g.*, *R.E.C. Corp.*, 307 NLRB 330,

333 (1992) ("Indeed even absent such evidence of financial 'looseness' of

employers, uncertified financial statements have not been deemed sufficient to

meet the employers' obligations under *Truitt*."); *Am. Model & Pattern*, 277 NLRB

176, 184 (1985) ("Respondent, in order to satisfy its duty to bargain in good faith,

was under a clear obligation to produce, for inspection and analysis, any and all

books and records available to it which would tend to support its bargaining

position."); *Tony's Meats, Inc.*, 211 NLRB 625, 626 (1974) (holding that an

employer must permit CPA to examine employer's records).

      Although Respondents argued before ALJ McCarrick that they need

not produce the documents due to confidentiality concerns, Respondents have not articulated any similar argument to this court why disclosure of their financial information must be limited.[25]  Rather, in opposition, Respondents acknowledge their duty to provide the Union financial information, but assert that under *Albany Garage, Inc.*, 126 NLRB 417 (1960), the information provided was sufficient.  The court disagrees.

In *Albany Garage*, the union requested wage increases, and in response, the employer asserted inability to pay and therefore provided the union a financial statement including a comparative sales and profit report for the year.  *Id.* at 431-32.  *Albany Garage* held that the employer did not violate the Act when it refused the union's subsequent request that auditors be given access to company records and that an independent arbitrator would determine whether the employer could afford the wage increase.  *Albany Garage* reasoned that (1) the request for auditor access and subsequent arbitration was unreasonable on its face given the parties' previous negotiations; (2) the union did not articulate what could be determined from an examination of the employer's books; (3) the financial

---

[25]  Respondents forego this argument of confidentiality for good reason -- ALJ McCarrick correctly explained that Respondents have the burden to establish the need to limit disclosure, *HTH Corp.*, 2011 WL 4073681, Doc. No. 36-1 at 34-35 (citing *R.E.C. Corp.*, 307 NLRB 330, 333 (1992)), and Respondents offered no compelling evidence that would support limiting disclosure.

information provided satisfied the employer's bank, mortgagee, and the tax authorities; and (4) the employer had previously given this same type of financial information to the union in prior years. *Id.* at 432. Unlike *Albany George*, (1) the accuracy of the financial information is in question because the Statements are not certified; (2) Respondents have presented no evidence that the Statements are sufficient in other contexts (such as to satisfy banks and/or tax authorities); and (3) the Union never previously accepted such general financial information from the Hotel. Further, although Minicola asserts that he provided similar information to the Union regarding a different employer, such a naked assertion does not carry Respondents' burden where Minicola does not explain the precise information that was provided and the circumstances of the production.

In sum, Respondents have failed to establish a basis to limit their disclosure of financial information to Nagaue and their refusal was not based on any good faith and reasonable interpretation of the March 29, 2010 Order. Indeed, Respondents should have known that the limited financial information they provided was wholly insufficient to support their plea of poverty, and that *Albany Garage* would provide them no relief. The court therefore finds that Petitioner has established by clear and convincing evidence that Respondents violated §§ 1(b), 1(e), and 2(a) of the March 29, 2010 Injunction by refusing to provide the

requested financial information.

## B.   Sanctions

Petitioner requests that Minicola, as an agent of Respondents, be held in contempt along with Respondents, and further requests a variety of compensatory sanctions for Respondents' numerous violations of the March 29, 2010 Injunction.

### 1.   *Minicola*

Pursuant to Federal Rule of Civil Procedure 65(d), an injunction:

> binds only the following who receive actual notice of it by personal service or otherwise:
>
> (A)   the parties;
>
> (B)   the parties' officers, agents, servants, employees, and attorneys; and
>
> (C)   other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Relevant to this action, "[a]n order to a corporation binds those who are legally responsible for the conduct of its affairs."  *United States v. Laurins*, 857 F.2d 529, 535 (9th Cir. 1988) (citing *NLRB v. Maine Caterers, Inc*., 732 F.2d 689, 691 (1st Cir. 1984)); *NLRB v. Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d 628, 633 (9th Cir. 1977) ("Generally, to be held liable in contempt, it is necessary that a non-party respondent must either abet the defendant or must be legally identified with him." (quotations omitted)).

74

Respondents can hardly argue that Minicola, as HTH's Regional Vice President and the Hotel's acting general manager and human resources manager, is not legally identified with Respondents such that he cannot be held in contempt for disobeying the March 29, 2010 Injunction. *See Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d at 634 ("A command to a corporation is in effect a command to those who are officially responsible for the conduct of its affairs."). As even he explained, Minicola "oversee[s] Hotel operations, legal -- all legal issues, any operational changes, the day-to-day business of the entities . . . ." Joint Ex. A at 27. Minicola is involved in financial and strategic planning for Respondents, negotiates and oversees contracts, oversees the day-to-day operations of the Hotel, conducts labor negotiations, and is the head of human resources. *Id.* at 28-30. Further, Minicola was well aware of the March 29, 2010 Injunction -- the March 29, 2010 Injunction was posted at the Hotel and Minicola even negotiated implementation of the terms of the March 29, 2010 Injunction. Finally, Minicola was directly involved in every violation of the March 29, 2010 Injunction -- he terminated Villanueva, unilaterally changed the housekeeping room requirements, and refused to provide requested information to the Union. In light of these circumstances, the reasoning explained in *Sequoia Dist. Council of Carpenters, AFL-CIO*, 568 F.2d at 634, for holding an officer in contempt applies with equal

75

force here:

> It is imperative that we hold these officers in contempt if we are to have respect for and obedience to our orders in such cases.  Our order was intended to protect legal rights.  Contempt proceedings are unnecessary when such rights are honored.  Responsibility must reach those with the power to alter the prohibited conduct.

The court therefore finds it appropriate (and perhaps even necessary to ensure compliance) that Minicola be held liable as an additional Respondent in contempt of the March 29, 2010 Order.[26]

### 2.    *Appropriate Compensatory Contempt Sanctions*

In light of the above violations of the March 29, 2010 Injunction, the court must now determine what compensatory sanctions are appropriate.  The court addresses each of the sanctions requested by Petitioner.

First, Petitioner requests that the court require Respondents, jointly and severally, to pay Villanueva, as compensatory damages, full wages, including estimated tips, and fringe benefits for all shifts and hours that they were required to assign Villanueva under the March 29, 2010 Injunction from July 12, 2010 (the date of Villanueva's suspension) through June 14, 2011 (the date the Board

---

[26] In requesting that Minicola be held liable as an additional Respondent, Petitioner did not draw any distinctions between Minicola and the other Respondents as to the particular compensatory sanctions requested.  The court finds it appropriate to hold Minicola liable as to only the non-monetary sanctions.

affirmed ALJ Kennedy's decision), plus interest.  The court agrees that these compensatory damages are appropriate.  As explained above, Petitioner established through clear and convincing evidence that Respondents terminated Villanueva in violation of the March 29, 2010 Injunction such that Villanueva should be compensated for his loss of income during this time period.

In opposition, Respondents argue that the court should not require Respondents to pay backpay to Villanueva because the Board will ultimately determine whether Villanueva was unlawfully terminated and the Board has the authority to award backpay.  Respondents further argue that should the Board find that Respondents properly terminated Villanueva, then Respondents will be unable to recoup any sanctions the court requires Respondents to pay to Villanueva.  The court rejects these arguments.  Although the Board will address whether Villanueva was unlawfully terminated, such determination is separate from this court's contempt determination; that the Board will also determine whether Villanueva was terminated in violation of the NLRA does not change that Villanueva is entitled to backpay for the violation of the March 29, 2010 Injunction.

As stated above, backpay should be calculated from July 12, 2010 through June 14, 2011, plus interest as normally computed in federal courts.

Because this sanction must be *compensatory*, however, any monies Villanueva was

paid during this time for other employment or unemployment compensation should

be deducted from the backpay amount.  To determine the amount of pay

Villanueva would have received from the Hotel during this time period,

Respondents shall make available to Petitioner, for inspection and reproduction, all

business and payroll records necessary and/or useful to compute these amounts.

Petitioner shall make available to Respondents, for inspection and reproduction, all

records reflecting Villanueva's employment-related income and/or unemployment

compensation from July 12, 2010 through June 14, 2011.  These records must be

made available by December 23, 2011.

> Petitioner also seeks compensatory damages for:
>
> [(1)] all the costs and expenditures [the Board] incurred
> in the investigation and prosecution of this contempt
> proceeding through June 13, 2011; these costs to include
> attorneys' fees of Board personnel; said amount, unless
> agreed upon by the parties, to be fixed by the Court upon
> further submission by the Board of documentation of
> costs and expenses in accordance with Local Rule 54.3;
> [and]
> [(2)] all the costs and expenditures incurred by [the
> Union] in the preparation and presentation of evidence to
> the Petitioner in Board Cases 37-CA-8064, 37-CA-8096,
> 37-CA-8097, 37-CA-8112, and 37-CA-8113, including
> any costs and expenditures incurred in the preparation for
> and participation in this contempt proceeding; such costs
> to include attorneys' fees incurred by the Union; said
> amounts, unless agreed upon by the parties, to be fixed

78

> by the Court upon further submission by the Board of
> documentation of costs and expenses in accordance with
> Local Rule 54.3.

Pet'r Amended Mot. at 17-18.  In opposition, Respondents argue that Petitioner

and the Union are not entitled to *any* fees and costs because the Motion for

Contempt is wholly duplicative of Petitioner's complaints before the Board and

was filed for unnecessary and improper purposes of seeking attorneys' fees.

Resp't Opp'n at 107-08.  In other words, the parties are at the two extremes --

Petitioner seeks all fees and costs for the Board and the Union regarding the

Motion for Contempt *and* the administrative proceedings, while Respondents argue

that Petitioner and the Union are entitled to no fees and costs whatsoever.

The court rejects both parties' positions.  Initially, the court agrees

with Petitioner that the Board and the Union should be compensated for their costs

and fees incurred in investigating and prosecuting the contempt proceeding

through June 14, 2011.  Petitioner has not, however, provided any explanation as to

why compensatory fees should include those costs and fees relating to proceedings

beyond the contempt proceeding.  Although the contempt and administrative

proceedings addressed the same general factual issues, they remain wholly separate

proceedings.  In other words, the Board and Union did not incur costs and fees in

the administrative proceedings because of Respondents' violation of the March 29,

2010 Injunction.  And just because Respondents' violations of the March 29, 2010 Injunction also constitute violations of the Act does not make Respondents responsible for *all* incurred costs and fees.

This same reasoning applies to explain why Respondents' argument that the Board and Union are entitled to no fees whatsoever must be rejected as well.  Although it is true that Petitioner asserted that Respondents' violations of the March 29, 2010 Injunction are also violations of NLRA, the latter allegations are subject to entirely separate proceedings (before ALJ McCarrick and now on appeal to the Board, as well as before this court on Petitioner's § 10(j) petition).  Indeed, it appears that there was no need for Petitioner to seek the November 21, 2011 § 10(j) Injunction until the Board entered its June 14, 2011 Order, which dissolved the court's March 29, 2010 Injunction.  The court agrees, however, that Petitioner should not receive a windfall by recovering full fees and costs for all of the work associated with the contempt proceeding, the administrative proceeding, and the § 10(j) proceeding.

Accordingly, the court finds that the Board and the Union are entitled to their reasonable costs and expenditures incurred in investigating and prosecuting the contempt proceeding through June 14, 2011.  The amount of these fees and costs will be determined pursuant to Local Rule ("LR") 54.3.  The parties shall first

meet and confer in good faith to determine whether they can reach agreement regarding a fee award and Villanueva's award.  *See* LR 54.3.  If the parties cannot reach agreement, Petitioner shall file a motion pursuant to LR 54.3 by January 20, 2012.  First, such Motion must address, in addition to the matters required by LR 54.3, what fees requested were reasonably incurred *solely* in conjunction with the investigation and prosecution of the contempt issue (that is, those fees that were incurred *only* on the contempt issue and were not also used for either the administrative proceeding or the § 10(j) proceeding), and were incurred only on those issues on which he was successful (*i.e.*, Petitioner cannot seek costs and fees related to investigating Respondents' banning of Mori and Labtingao from the Hotel).  Second, to the extent work product was also used for the administrative proceeding and/or § 10(j) proceeding, Petitioner should address his view of what reasonable portion of that work product should be included in a fee award.  That is, based on the unusual procedural posture of this matter where the contempt and NLRA violations substantially overlapped, it appears that some degree of apportionment must be made.  Failure to follow these instructions and LR 54.3 may result in denial of such motion with prejudice.  *See* LR 54.3(g).  Respondents may file an Opposition by February 17, 2012, and Petitioner may file a Reply by February 24, 2012.

Finally, Petitioner requests that the court require:  (1) Respondents to post copies of the Contempt Order at the Hotel in all places where the March 29, 2010 Injunction was posted; (2) Minicola to read the Contempt Order to all current employees within fifteen days of its entry; and (3) Respondents to serve upon the court, within twenty days of the Contempt Order, a sworn affidavit by a responsible corporate official setting forth with specificity the manner in which Respondents have complied with the terms of the Contempt Order to date.[27]  The court agrees that these steps are necessary to implement the Contempt Order and also make Hotel employees aware that (1) Respondents violated the March 29, 2010 Injunction; and (2) Respondents are held in contempt for their violations.

## V.  CONCLUSION

In sum, the court finds that Petitioner has established by clear and convincing evidence that Respondents violated the March 29, 2010 Injunction by (1) disciplining and terminating Villanueva; (2) unilaterally changing the number of rooms housekeepers must clean; and (3) refusing to provide the Union requested information.  Compensatory sanctions are therefore warranted, including, as explained in the court's separate Contempt Order, (1) backpay for Villanueva from

---

[27] Because the attorneys' fees issue will not be determined before Respondents' affidavit is due, such affidavit need not address this issue.

July 12, 2010 through June 14, 2011; and (2) Petitioner's costs and fees in seeking

contempt sanctions through June 14, 2011 on those issues

Petitioner was successful (which will be the subject of a Motion filed by Petitioner

by January 20, 2012).

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 29, 2011.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*Norelli v. HTH Corp et al.*, Civ. No. 10-00014 JMS/RLP, Order Granting in Part and Denying in Part Petitioner's Amended Motion for Adjudication and Order in Civil Contempt and for Compensatory Relief